UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| WCW, Inc.,<br><br>    Plaintiff,<br><br>    v.<br><br>Atlantis Industries, Inc. and<br>Kevin Dyevich,<br><br>    Defendants / Counter-Claimants /<br>Third-Party Plaintiffs,<br><br>    v.<br><br>M.P.L., Ltd., Bahamas; M.P.L., Inc., Belize;<br>John M. Wilkinson; and WCW, Inc.,<br><br>    Third-Party Defendants / Counter-<br>Claim Defendants. | Civil Action No. 5:19–cv–243–gwc–kjd |

## <u>ORDER</u>
(Docs. 60, 61)

Before the Court are WCW, Inc.'s Motion for Arbitration and Third-Party Defendants/ Counter-Claim Defendants'—M.P.L., Ltd., Bahamas, M.P.L., Inc., Belize, and John M. Wilkinson—Motion to Compel Arbitration.  (Docs. 60, 61.)  WCW and Third-Party Defendants both contend that the arbitration clause contained within a 2001 Royalty Agreement requires that this matter be returned to arbitration for resolution.  Defendants/Counter-Claimants/Third-Party Plaintiffs Atlantis Industries, Inc. and Kevin Dyevich assert that the matter should remain in federal court because both WCW and Third-Party Defendants have either waived their right to arbitration or are now judicially estopped from enforcing that right.  (Docs. 62, 63.)

On the present record, however, the Court is unable to determine whether WCW or Third-Party Defendants are contractually entitled to arbitration under the Royalty Agreement. As explained further below, the Court requires additional evidence in order to make a Report and Recommendation on the pending Motions.

**Background**

## I.    Origins of the Dispute

In a January 14, 2021 Order on WCW's Motion to Dismiss Counterclaims, Chief Judge Crawford summarized "the broad outlines of the parties' conflict."  (Doc. 51 at 3.)  This Order assumes familiarity with the comprehensive factual background in the January 2021 Order as supplemented by the facts in the record that are material to the pending Motions.[1]

The contract claims in this case originally arose "between John Wilkinson, an inventor and manufacturer of a new style of mattress, and Kevin Dyevich, a wholesale vendor of mattresses."  (*Id.*)  When the two met in 1994, Dyevich believed that Wilkinson was CEO and owner of WCW, Inc., a mattress manufacturing company.  (Doc. 18 at 4, ¶ 1.)  Wilkinson introduced Dyevich to a mattress design with patented "Self-Adjusting Technology" (SAT) (*id.* at 5, ¶ 5; Doc. 36 at 2, ¶ 5), and Dyevich helped sell mattresses containing this design to the New York metropolitan area medical marketplace (Doc. 18 at 5, ¶ 8).  To encourage further sales, Dyevich and WCW engaged with Kinetic Concepts, Inc. (KCI), a prominent mattress distributor, for which WCW agreed to manufacture mattresses.  (*Id.* at 6, ¶ 11; Doc. 36 at 3–4, ¶ 11; Doc. 56 at 2, ¶ 11.)  Dyevich alleges that, in January 2000, he entered into a licensing agreement with WCW and KCI governing the proceeds of the mattress sales.  (Doc. 18 at 6, ¶ 14.)  WCW states, however, that it entered into an agreement with only KCI.  (Doc. 56 at 3, ¶ 14.)

---

[1]  While the background facts are derived from the pleadings, motions, and related attachments submitted to date, the Court "must draw all reasonable inferences in favor of the non-moving party."  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

A Royalty Agreement (Agreement) related to the "M.P.L. Licensing Agreement"—which governed rights in "SAT Products"—was then executed in April 2001.  (Doc. 60-3 at 3, 8.)  The preamble of the Agreement listed as parties Atlantis Industries, Inc. (of which Dyevich was president), WCW, Wilkinson, and MPL, Ltd., Bahamas (Wilkinson's offshore company, which later became MPL, Inc., Belize).  (*Id.* at 2; *see* Doc. 18 at 6, ¶¶ 12, 16; Doc. 36 at 4, ¶ 12; Doc. 56 at 2, ¶ 12.)  As the Court observed in its January 2021 Order:

> In several of the terms[,] the typewritten text is altered with handwritten markings and initials in the margin.  One definition (regarding affiliates) is completely stricken, and John Wilkinson's and Kevin Dyevich's handwritten initials are in the margin.  In five instances, the typewritten phrase "WCW" is stricken[,] and in four of those instances[,] it is replaced with the handwritten phrase "MPL."  Only John Wilkinson's initials appear next to those alterations.

(Doc. 51 at 9 (citation omitted).)

The Agreement provides that Dyevich is entitled to receive one-third of the royalties from sales of the SAT Products.  (Doc. 60-3 at 2.)  The Royalty Agreement also contains the following arbitration clause:

> If a dispute arises between the parties to this Agreement for any reason, even if the dispute involves the interpretation and/or validity of this Agreement, all said such disputes shall be resolved by way of arbitration.  The Rules of Arbitration shall be that of the American Arbitration Association Commercial Arbitration Rules.  There shall be a selection of one arbitrator that has a legal degree that will be responsible for arbitrating all issues.  The arbitrator shall be bound by the exact terms of this Agreement and the plain meaning and language of the interpretation of this Agreement.  The arbitrator must follow all of the Rules and Regulations of the Court of the State of New Jersey, the arbitration must be held in the State of New Jersey and the arbitrator must follow all of the common and/or statutory laws that may be in effect as of the date of this Agreement up through the time of any dispute and decisions.

> The cost of the arbitrator shall be borne equally amongst the parties.  The arbitrator will have at his or her discretion, an ability to award legal fees to either side if the arbitrator deems any claims and/or defenses are without <u>reasonable</u> merit.

> The decision of the arbitrator shall be final and not appealable.

(*Id.* at 6, ¶ 10.)  No party disputes that, after the Agreement's execution, WCW made several payments to Atlantis Industries.  (Doc. 18 at 11, ¶ 55; Doc. 36 at 9, ¶ 50; Doc. 56 at 6, ¶ 55.) However, those payments ended in 2004.  (Doc. 18 at 11, 12, ¶¶ 56, 59; Doc. 56 at 6–7, ¶¶ 56, 59.)  According to Defendants, WCW promised Dyevich for several years that payments would resume, but WCW made no further payments to him or Atlantis Industries.  (Doc. 18 at 9, ¶¶ 38– 39.)

## II.    **Previous Arbitration Efforts**

In 2009, Dyevich commenced arbitration against WCW, MPL, and Wilkinson pursuant to the terms of the Agreement.  (*Id.* ¶ 39; Doc. 56 at 5, ¶ 39.)  In total, Dyevich took the Agreement's alleged parties to arbitration on three separate occasions.  (Doc. 36 at 15, ¶ 92; Doc. 40 at 4, ¶ 24.)  On the first attempt, he ended arbitration proceedings after he and several of his affiliates entered into a General Release with WCW, MPL, and Wilkinson.  (Doc. 1 at 3, ¶ 17; Doc. 18 at 2, ¶ 17; Doc. 36 at 13, 14 ¶¶ 80, 82; Doc. 40 at 3, ¶¶ 12, 14.)  Dyevich again brought the same claim in arbitration in 2013, but he ultimately abandoned proceedings.  (Doc. 36 at 14, ¶ 83; Doc. 40 at 3, ¶ 15.)  When he sought arbitration a third time in late 2018, WCW requested that the arbitrator dismiss the proceedings.  (Doc. 1 at 2, ¶ 8; Doc. 18 at 2, ¶ 8; Doc. 36 at 14, ¶ 84; Doc. 40 at 3, ¶ 16.)

WCW asserted several bases for dismissal of arbitration proceedings in 2018.  First, WCW contended that it was not a party to the Royalty Agreement.  (Doc. 1-2 at 6–7.)  WCW asserted that there was no "meeting of the minds" between WCW and Atlantis Industries because WCW was "deleted" from the Agreement, and the Agreement was not signed by an officer authorized to bind WCW.  (*Id.*)  Second, WCW claimed that Dyevich failed to disclose his right to royalty payments during bankruptcy proceedings in 2000.  (*Id.* at 8–9.)  In WCW's view, therefore, the alleged royalty rights had become an asset of the bankruptcy estate that Dyevich

could not pursue in arbitration. (*Id.* at 9–10.) Third, WCW contended that New Jersey's six-year statute of limitations for contract claims barred Dyevich's claim that he was owed royalty payments fourteen years after WCW allegedly made its last payment in 2004. (*Id*. at 11–14.) Finally, WCW argued that Atlantis Industries lacked standing to compel arbitration because the corporate entity no longer existed, according to a statement Dyevich purportedly made during a deposition in prior federal litigation in the Northern District of New York. (*Id*. at 15–16.)

Before the arbitrator ruled on the motion, WCW filed this action in federal court to enjoin further arbitration. (Doc. 1 at 2, ¶¶ 8, 24.)

## III.   WCW Files Its Complaint in This Court and Arbitration Is Stayed

The Court briefly recounts the litigation history since the filing of WCW's Complaint because it demonstrates the disputed facts that are material to the pending Motions.  In its Complaint, WCW requested declaratory and injunctive relief against both Atlantis Industries and Dyevich. (*Id.* at 1.)  WCW alleged that Atlantis Industries had commenced arbitration against WCW, MPL, and Wilkinson based on the terms of a Royalty Agreement between the parties. (*Id*. at 1–2, ¶¶ 5, 6, 12.)  WCW sought a declaration from the Court that it was not a party to the Royalty Agreement and an injunction restraining Atlantis Industries from prosecuting any claims against WCW in arbitration. (*Id.* at 5, ¶ 36.)

WCW's Complaint alleged several reasons for its entitlement to relief.  First, WCW asserted that, because its name was crossed out in the Royalty Agreement during negotiations, WCW was not a named party to the contract. (*Id*. at 2–3, ¶¶ 14–15.)  WCW further alleged that Dyevich and his affiliated companies had entered into a 2009 agreement with WCW "to resolve all issues that involved any agreements between the parties." (*Id.* at 3, ¶ 17.)  Finally, WCW alleged that, during bankruptcy proceedings in 2000, "Dyevich did not list Atlantis Industries, Inc. or the Royalty Agreement as possible assets of the debtor" (*id*. ¶¶ 19–20), apparently

5

suggesting that Dyevich and/or Atlantis Industries could not possess an interest in the Agreement.

Dyevich and Atlantis Industries then filed an Answer and Counterclaims, as well as a Third-Party Complaint, against WCW, the MPL entities, and Wilkinson. (Doc. 18.) According to Defendants, these counterclaims are essentially the same claims that they brought in arbitration. (Doc. 63 at 3.)

WCW sought dismissal of these counterclaims on the same grounds that it asserted to dismiss the 2018 arbitration. (Doc. 27.) For example, WCW disputed that it had formed an agreement to make royalty payments because the parties had no "mutual intent to be bound by the terms and conditions of [the] agreement." (*Id.* at 6.) The company reasoned that it had no intent to be bound because "WCW" had been crossed out in the payment provision and the royalty definition. (*Id.*) WCW further contended that Wilkinson had neither actual nor apparent authority to act on WCW's behalf when the agreement was executed. (*Id.* at 6–7.) WCW alleged that Wilkinson was not an owner or officer within the company, and Defendants had not alleged that WCW manifested an intent for Wilkinson to act on the company's behalf. (*Id.*)

Defendants replied that the "obviously disputed facts" prevented the Court from deciding these issues on a motion to dismiss. (Doc. 32 at 3.) According to Defendants, Wilkinson's representations—both when signing the Royalty Agreement and providing royalty payments for a period of years thereafter—and the parties' long course of dealing conflicted with WCW's assertion that he lacked apparent authority to enter into the Agreement on behalf of WCW. (*Id.*) Regardless of whether Wilkinson had that authority, Defendants contended that WCW had ratified the Agreement by making royalty payments to Dyevich. (*Id.* at 4.) Defendants also argued that the parties' intentions behind manually deleting certain terms within the Agreement could not be decided at the motion-to-dismiss stage. (*Id.* at 4–5.)

In the January 14, 2021 Order denying WCW's Motion to Dismiss, Chief Judge Crawford observed that it is "difficult to discern any relevant conduct undertaken by WCW independent of Wilkinson's conduct." (Doc. 51 at 26.) The Court further observed that the allegations plausibly supported a ratification theory whereby WCW's "payment of nearly half a million dollars in royalties after Wilkinson signed the Royalty Agreement would amount to a significant failure to repudiate what, in WCW's view, was Wilkinson's unauthorized act of signing the Royalty Agreement." (Doc. 51 at 27.) As to whether WCW should be deemed a party to the Agreement, the Court could not decide, solely based on the pleadings, the effects of the crossed-out references to WCW in the Agreement's material terms. (*Id.* at 27–28.) The Court noted that "neither [party] seeks arbitration," relying on the parties' "mutual albeit implicit consent," and continued the stay of arbitration in favor of resolving "the issues raised in the counterclaim and other remaining claims through litigation in this forum." (*Id.* at 28–29.) The Court further held that "[t]he final judgment order will reflect the parties' agreement that neither seeks to enforce the arbitration clause in the Royalty Agreement." (*Id.* at 29.)

The discovery process continued, during which Defendants produced documents to Third-Party Defendants and answered interrogatories. (Doc. 59.) According to Defendants, WCW and Third-Party Defendants have not provided answers or documents in response to Defendants' requests. (Doc. 62 at 7–8; Doc. 63 at 7–8.) At a February 2021 status conference, WCW asserted that it had not waived any right to arbitration. (Doc. 61 at 2.) The Court then ordered that any party intending to invoke a right to arbitration had to do so by March 15, 2021. (Doc. 58; Doc. 61 at 2.)

## IV.   WCW and Wilkinson/MPL Entities Seek to Compel Arbitration

On March 8, 2021, WCW and Third-Party Defendants filed their Motions to compel arbitration. (Docs. 60, 61.) WCW contends that, while it is not a party to the alleged Royalty

Agreement between the parties, it should not have to select litigation or arbitration until the Court has declared WCW's status under the Royalty Agreement.  (Doc. 61 at 2.)  Nevertheless, WCW asserts that "[t]he Royalty Agreement contains a broad arbitration clause," and it invokes that clause to return the parties' dispute to arbitration.  (*Id*. at 1, 3.)  Defendants counter that WCW's commencement of this federal action and its course of conduct are inconsistent with an intent to arbitrate.  (Doc. 63 at 2.)  Accordingly, Defendants reason that WCW has waived its right to arbitrate at this late stage.  (*Id.* at 5–10.)[2]  WCW replies that there is a "strong presumption in favor of arbitration" and denies that the filing of its federal Complaint acts as a waiver of arbitration.  (Doc. 65 at 2, 3.)

Wilkinson and the MPL entities separately contend that "the arbitration provision in the Royalty Agreement clearly constitutes an agreement to arbitrate between at least Third-Party Defendants and the Defendants/Third-Party Plaintiffs."  (Doc. 60-1 at 6.)  They also note that the matter was already in arbitration when WCW suspended proceedings by bringing the action to federal court.  (*Id*. at 8.)  Defendants assert that waiver and judicial estoppel also foreclose arbitration as to Wilkinson and the MPL entities.  (Doc. 62.)  But Wilkinson and the MPL entities contend that Defendants have failed to meet the legal standard for application of either doctrine (Doc. 66).

### Discussion

### I.    Legal Standard

Under the Federal Arbitration Act (FAA), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of [the] contract . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  Although the FAA "embod[ies] a national policy

---

[2] Defendants argued at the August 2021 hearing that judicial estoppel prohibits both WCW and Third-Party Defendants from compelling arbitration.

favoring arbitration," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011), it "does not require parties to arbitrate when they have not agreed to do so," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).[3]  "Thus, before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017); *see Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 303 (2010) (noting that a court will apply "the presumption favoring arbitration . . . only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed").[4]  Accordingly, "it is for courts to decide" formation issues such as "whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006); *accord Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 757 (S.D.N.Y. 2019).  When resolving these issues, "courts generally should apply ordinary principles that govern the formation of contracts."  *Granite Rock*, 561 U.S. at 296.

In deciding a motion to compel arbitration, the Court employs a "standard similar to that applicable for a motion for summary judgment."  *Nicosia*, 834 F.3d at 229.  "[T]he court

---

[3]  Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

[4]  In support of their request to compel arbitration, Third-Party Defendants state that "[i]t is well established that a party may dispute the overall validity of an agreement, yet still compel arbitration pursuant to a specific clause contained in the agreement."  (Doc. 66 at 8 (citations omitted).)  However, "[t]he issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006).  In other words, a court cannot address a dispute over an agreement's enforceability—as opposed to its formation—if the agreement contains an arbitration clause.  *Id.* at 449; *cf. Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 n.1 (2010) (distinguishing "the parties' *manifestation of intent*" from "the agreement's *validity*" since "[t]he *validity* of a written agreement to arbitrate" is defined as "whether it is legally binding, as opposed to whether it was in fact agreed to").  As discussed further in Part II.B. of this Order, a court may not enforce an arbitration clause without first determining whether the parties to the dispute actually formed the contract containing the arbitration clause.

considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits and draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74.  In applying this standard, "[w]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id*.  But "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Nicosia*, 834 F.3d at 229.

## II.     Because it is not clear that the parties formed the contract containing the arbitration clause, the Court cannot at this time separately consider that clause's enforceability.

WCW and Third-Party Defendants contend that their right to arbitration arises from the arbitration clause within the Royalty Agreement.  Defendants appear to acknowledge that WCW and Third-Party Defendants have a right to arbitration under the Agreement, but they claim that WCW and Third-Party Defendants' engagement in this federal litigation now renders arbitration unavailable.  Specifically, Defendants claim that (i) by filing suit and litigating their claims, WCW has waived any right that it or Third-Party Defendants had to arbitration, and (ii) even if there is no waiver, WCW and Third-Party Defendants' choice to pursue litigation in court judicially estops them from arbitrating their claims.

As the history recounted above demonstrates, however, the parties' intent to form the Royalty Agreement is not evident.  Any right to enforce the arbitration clause is directly dependent on whether the parties validly formed the Royalty Agreement containing the arbitration clause.  In other words, the Court cannot compel arbitration in the absence of a valid contract.

**A.      The present record contains insufficient evidence that the parties formed an agreement.**

"[A]rbitration is a matter of contract," *Rent-A-Ctr., W., Inc.*, 561 U.S. at 67, and "parties

are not required to arbitrate unless they have agreed to do so," *Meyer*, 868 F.3d at 73; *see*

*Hampton v. ADT, LLC*, No. A-0172-20, 2021 WL 1713295, at *5, 8. (N.J. Super. Ct. App. Div.

Apr. 30, 2021) (remanding agreement containing arbitration clause because "material facts on

the threshold issues of contract formation . . . [we]re disputed").  As a result, when deciding if

"the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . .

should apply ordinary state-law principles that govern the formation of contracts." *First Options*

*of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see Larsen v. Citibank FSB*, 871 F.3d 1295,

1303 n.1 (11th Cir. 2017) ("[W]e defer solely to applicable state-law principles in determining

the quality and quantum of evidence required to deny or prove the existence of an agreement.").

**1.      Facts regarding the formation of the Royalty Agreement through mutual assent are in dispute.**

Under New Jersey law,[5] an agreement requires mutual assent to be enforceable.  *Morgan*

*v. Sandford Brown Inst.*, 137 A.3d 1168, 1180 (N.J. 2016).  Specifically, "[a] written contract is

formed when there is a 'meeting of the minds' between the parties." *Morton v. 4 Orchard Land*

*Tr.*, 849 A.2d 164, 170 (N.J. 2004).  "[M]utual assent requires that the parties have an

understanding of the terms to which they have agreed." *Silvera v. AristaCare at Cherry Hill,*

*LLC*, No. A-0519-20, 2021 WL 1186555, at *4 (N.J. Super. Ct. App. Div. Mar. 30, 2021)

(quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 313 (N.J. 2014)).  "When a New

Jersey court is called on to enforce an arbitration agreement, its initial inquiry must be—just as it

---

[5] For the reasons stated in the Court's January 2021 Order, this Order applies New Jersey law to the parties' competing contract claims; namely, whether the parties intended to form an agreement, and whether WCW was bound under the Royalty Agreement based on (1) Defendants' reasonable reliance on the apparent authority of Wilkinson to sign the Agreement; and/or (2) WCW's ratification of the Agreement through the payment of royalties to Defendants.

is for any other contract—whether the agreement to arbitrate all, or any portion, of a dispute is the product of mutual assent, as determined under customary principles of contract law." *Flanzman v. Jenny Craig, Inc.*, 236 A.3d 990, 1001 (N.J. 2020).

The parties dispute who is subject to the Royalty Agreement. In both its motion to dismiss the 2018 arbitration and its Complaint in this Court, WCW has taken the position that it is not a party to the Agreement. (Doc. 1-2 at 6–7; *see* Doc. 56 at 5, ¶ 41.) WCW claims that "WCW" was stricken from both the Agreement's royalty definition and payment provision, which precluded a "meeting of the minds" to form a valid agreement. (Doc. 27 at 6; Doc. 31 at 3.) Although Wilkinson appears to have signed the Royalty Agreement on WCW's behalf, WCW claims that Wilkinson was not authorized to do so or to otherwise bind the company. (Doc. 27 at 6–7; Doc. 56 at 2, 3–4, ¶¶ 10, 27.) Defendants respond that Wilkinson held multiple roles within WCW—including "CEO," "owner," and "Chairman"—which gave him that authority. (Doc. 18 at 5, 8, ¶¶ 10, 27.) Defendants further claim that WCW's course of conduct has been inconsistent with an intent to arbitrate. (Doc. 63 at 2.) According to Defendants, that course of conduct includes WCW's refusal to pay its portion of arbitration costs in 2013; initially refusing to engage in arbitration in 2018 and then moving to dismiss the arbitration; and filing its federal Complaint asserting that it was not a party to the Royalty Agreement. (*Id.* at 2–3.)

The parties also dispute who signed the Royalty Agreement. Defendants claim that Wilkinson executed the Agreement. (Doc. 18 at 7, ¶ 19.) WCW denies that anyone signed on its behalf (Doc. 56 at 3, ¶ 19), and while the company assumed for the purposes of a motion to dismiss that Wilkinson signed the Agreement, it otherwise did not admit or deny that he did so (*see* Doc. 27 at 6 ("For the purposes of a motion to dismiss it cannot be disputed that John Wilkinson signed on a signature line with WCW's name underneath it and not for himself individually.")).

12

Third-Party Defendants also appear to have advanced inconsistent positions on Wilkinson's involvement in the execution of the Royalty Agreement and the legal effect of his involvement.  They asserted in their Answer to the Defendants' Third-Party Complaint that Wilkinson had no memory of signing the Royalty Agreement.  (Doc. 36 at 5, 6, ¶¶ 19, 24–25, 27 ("John Wilkinson has no recollection of signing or reviewing this document.").)  This is consistent with their prior position in arbitration.  (Doc. 63-1 at 2, ¶ 3 ("I never executed the purported Royalty Agreement . . . in a personal capacity . . . .  I have no recollection of signing the alleged agreement on behalf of WCW, Inc. . . . ."); *see id.* at 5, ¶ 10.) In moving to compel arbitration, however, Third-Party Defendants contend that Wilkinson did execute the Agreement with Dyevich.  (Doc. 60-1 at 3 ("In and around February and April 2001, Wilkinson and Dyevich entered into an Agreement."); *see id.* ("Defendants/Third-Party Plaintiffs have filed three separate counterclaims against Third-Party Defendants, all of which arise out of a 2001 Agreement that was entered into by Wilkinson and Dyevich.").)  In their most recent filing, Third-Party Defendants again suggest that, while Wilkinson may not be a party to the Agreement, that issue is one for the arbitrator to decide.  (*See* Doc. 66 at 9 ("[W]hile Wilkinson may contend that he is not a party to the Agreement or even that he has no recollection of signing the Agreement, such issues must be resolved by the arbitrator pursuant to the Agreement's broad arbitration clause.").)

The parties do not agree on whether Wilkinson held a position within WCW that would have allowed him to bind the company by signing the Agreement.  Additionally, Third-Party Defendants' position on whether Wilkinson entered into the Royalty Agreement has not been consistent from the time federal proceedings began.  Even if Wilkinson were to have signed the Agreement in only a personal capacity, the parties have proffered several scenarios as to what

13

may have resulted from the purported agreement between Dyevich and Wilkinson.[6]  The results are quite different depending on the scenario, ranging from no agreement at all to an agreement as to all parties except WCW.  Given the uncertainty regarding fundamental aspects of the Agreement—primarily, who signed the Agreement and which parties were bound as a result—the Court cannot determine at this stage whether the parties formed the disputed Agreement.

> ### 2.  The Court may not find that an enforceable contract exists based on apparent-authority or ratification theories.

Separate from the lack of evidence establishing the formation of the Agreement, the Court also cannot determine on the present record whether a valid contract nevertheless resulted based on principles of apparent authority or ratification.  "[A]n agent may bind a principal to contracts with third[ ]parties for acts that are within the agent's actual or apparent authority." *Recom Corp. v. Miller Brothers, a Div. of Wampole-Miller, Inc.*, No. CV 16-3320 (SRC), 2018 WL 3930090, at *5 (D.N.J. Aug. 16, 2018).  Under New Jersey law, this authority is only "created by the conduct of the alleged principal[,] and it cannot be established alone and solely by proof of conduct by the supposed agent." *Id.*  Such conduct may include the parties' "general course of conducting the business."  *Id.* (quoting *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)).

Defendants contend that Wilkinson's representations and "the parties' long course of dealing" both "support the conclusion that he was authorized to act on behalf of the company." (Doc. 32 at 3.)  WCW denies that Wilkinson was in a position of actual authority.  (Doc. 34 at 2.) Consequently, WCW insists that he could not execute the Agreement on the company's behalf,

---

[6]  The possible scenarios are as follows: (i) an agreement was formed between all parties except WCW after Dyevich did not object to the handwritten deletions of WCW from the Agreement; (ii) no agreement was formed because Dyevich refused to add his initials to the changes, thus preventing a "meeting of the minds" on the essential terms; or (iii) an agreement was formed with all typewritten terms except the deletion of WCW from the "affiliate" definition, a change to which Dyevich added his initials.  (Doc. 51 at 27–28.)

and no principal within the company authorized Wilkinson to sign the Agreement or issue royalty checks from the company's bank account.  (*Id.* at 2–3.)  WCW has not identified who could have bound the company instead.  Wilkinson allegedly attested in arbitration that, at the time of the Agreement's signing, members of his family owned WCW and that he was chairman of WCW.  (Doc. 62-1 at 2, ¶ 3.)  While Third-Party Defendants also clarified at the August 2021 hearing that Wilkinson was a "non-executive" chairman, they did not indicate who exercised binding authority at WCW at the time of the contract's execution.  Without a clearer understanding of who served as a WCW principal at the relevant time, it is difficult to assess whether Defendants reasonably relied on Wilkinson's apparent authority to contract on WCW's behalf and therefore whether the alleged parties could have formed an agreement.  *See Recom Corp.*, 2018 WL 3930090, at *5.

Ratification is "the affirmance of a prior act done by another whereby the act is given effect as if done by an agent acting with actual authority."  *Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 WL 6061405, at *6 (D.N.J. Nov. 20, 2018) (quoting Restatement (Third) of Agency, § 4.01 (2006)).  This requires both the "intent to ratify plus full knowledge of all the material facts."  *Martin Glennon, Inc. v. First Fid. Bank, N.A.*, 652 A.2d 199, 205 (N.J. Super. App. Div. 1995).  While an "intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it . . . in most cases, the silence or inaction of a principal will not ratify the agent's unauthorized act unless it is clear that the principal was fully informed of what the agent did."  *Reibman v. Myers*, 164 A.3d 1080, 1090 (N.J. Super. Ct. App. Div. 2017).

Defendants assert that because WCW permitted royalty payments to be sent to Dyevich, it ratified the accompanying terms of the Royalty Agreement.  (Doc. 32 at 4.)  It is undisputed that that WCW paid Dyevich for a period of time after the Royalty Agreement's execution.

15

(Doc. 18 at 11, ¶ 55; Doc. 36 at 9, ¶ 50; Doc. 56 at 6, ¶ 55.)  WCW explains that it did so "at John Wilkinson and the MPL parties' request and behalf."  (Doc. 56 at 6, ¶¶ 55–56.)  But it does not say who in the company approved those payments and whether that person, as principal, was "fully informed" of what Wilkinson may have agreed to as agent.  *See Reibman*, 164 A.3d at 1090.  Therefore, it cannot be discerned whether WCW became contractually obligated by ratification of Wilkinson's actions.

### B.   The uncertainty of an underlying agreement precludes the Court from severing the arbitration clause and separately enforcing it.

The parties appear to suggest that the Court can compel arbitration without reviewing the formation of the Royalty Agreement in which the arbitration clause is contained.  In other words, they appear to contend that the arbitration clause is severable and enforceable separate from the Agreement in which it is contained.  As explained below, the Court cannot determine on the present record that the arbitration clause is severable from the Agreement.  *See Buckeye*, 546 U.S. at 447–48.

### 1.   Severability of an Arbitration Clause and Contract Formation

When considering a motion to compel arbitration, a court ordinarily must resolve two threshold questions: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue."  *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).  If an arbitration clause delegates the topic of arbitrability to an arbitrator, the parties' agreement to arbitrate is then severable—and therefore, separately enforceable—regardless of the enforceability of the underlying contract.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406–07 (1967).  This concept derives from Section 2 of the FAA, which "states that a 'written provision' 'to settle by arbitration a controversy' is

16

'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70 (quoting 9 U.S.C. § 2).

Severability of the arbitration clause from the underlying agreement presupposes the existence of that underlying agreement. Under Section 4 of the FAA, parties can arbitrate only upon a showing "that the making of the agreement for arbitration . . . is not in issue." 9 U.S.C. § 4. Therefore, if the parties did not clearly agree to arbitrate, a court cannot compel compliance with an agreement that does not exist. It follows that, if the formation of a contract containing an arbitration clause is uncertain, a court has no authority to enforce the arbitration clause.

The Third Circuit recently examined the interplay between formation of a contract and severability of an arbitration clause. In *MZM Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, the parties disputed whether a signed, one-page contract that incorporated an unsigned collective bargaining agreement's terms—including an arbitration clause—was void due to fraud in the execution, thereby preventing the parties' mutual assent to the incorporated agreement. 974 F.3d 386, 392–93 (3d Cir. 2020). The court considered the "'mind-bending' question" of whether a federal court should decide "whether an agreement exists, when the putative agreement includes an arbitration provision empowering an arbitrator to decide whether an agreement exists." *Id.* at 392. The issue lies "at the intersection of the severability doctrine" arising from Section 2 of the FAA, "which requires that an unchallenged [arbitration] provision in a disputed contract" delegating the arbitrability of a dispute to an arbitrator "be enforced as presumptively valid, and [S]ection 4 of the FAA, which . . . 'affirmatively requires' a court to rule on the formation of the [underlying] contract." *Id.* at 400.

The Third Circuit held that the question was one for the court to resolve, as the court will inevitably "need to decide questions about the parties' mutual assent to the [underlying] contract

to satisfy itself that an arbitration agreement exists and *vice versa*." *Id.* "Indeed, it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute." *Id.* at 401. The court acknowledged that the parties could still agree to arbitrate the matter, but that right must exist "outside the contract whose formation or existence is being disputed," such as by "stipulation to submit their entire dispute to arbitration." *Id.* at 402.

Similarly here, the very existence of the Agreement appears to be in dispute. The Court cannot sever and enforce an arbitration clause without first determining whether the parties to the dispute actually formed the contract containing the arbitration clause.

### 2. The Court cannot sever the arbitration clause from the Royalty Agreement.

WCW and Third-Party Defendants each advance a separate argument for why they are entitled to arbitration. Third-Party Defendants appear to acknowledge that Wilkinson is a party to the Royalty Agreement and they are therefore entitled to invoke the Agreement's arbitration clause. (Doc. 60-1 at 6.) However, Third-Party Defendants also state that "Wilkinson . . . assert[ed] in an affidavit that '[he] never agreed on behalf of MPL or [himself] to arbitrate any disputes with Mr. Dyevich.'" (Doc. 66 at 8 (quoting Doc. 62-1 at 4).) They also claim that "Wilkinson averred that he would be participating"—and that both he and Third-Party Defendants were "in fact participating"—in arbitration proceedings when this action was filed. (*Id.*) Third-Party Defendants further assert that "Wilkinson may contend that he is not a party to the Agreement or even that he has no recollection of signing the Agreement," but "such issues must be resolved by the arbitrator pursuant to the Agreement's broad arbitration clause." (*Id.*;

*see id.* at 8 ("It is well[-]established that a party may dispute the overall validity of an agreement, yet still compel arbitration pursuant to a specific clause contained in the agreement.").)

WCW has not asserted that it is a party to that Agreement—in fact, it expressly notes that its "complaint asserted that [WCW] was not a party to the Royalty Agreement."  (Doc. 61 at 1.) WCW does not explain how, if it is not a party, it is entitled to derive any benefit from the Agreement or the arbitration clause within it.  Rather, WCW observes that the "Royalty Agreement was attached to the Complaint" and "contains a broad arbitration clause" (*id.* at 1), emphasizing the "strong presumption in favor of arbitration" (*id.* at 3).  WCW asserts that it "neither accepted nor waived the arbitration clause" by filing the Complaint in federal court, since "it is not a party to the Royalty Agreement or the arbitration clause that is included in the Royalty Agreement."  (Doc. 50 at 2–3.)  WCW also does not explain how it could waive or accept the arbitration clause in the Agreement to which it is not a party.

The arbitration clause in the Royalty Agreement states that any "dispute . . . between the parties to this Agreement for any reason," including "the interpretation and/or validity of th[e] Agreement," is to "be resolved by way of arbitration."  (Doc. 60-3 at 6, ¶ 10.)  As noted, with the question of the Royalty Agreement's formation unresolved, the Court cannot determine whether to compel arbitration based on the arbitration clause within that Agreement.  The Court cannot sever the arbitration clause from an underlying contract that the parties have not clearly agreed to enter.  *See* 9 U.S.C. § 4; *MZM Constr'n Co.*, 974 F.3d at 401.  WCW acknowledges that an arbitration clause within an unenforceable contract may not be severed and separately enforced. (*See* Doc. 50 at 3 ("An alternative dispute resolution clause is not separately enforceable from the unenforceable contract.  If the contract does not exist, the agreement to arbitrate does not

exist.").)[7]  The parties could have stipulated to arbitration, but they have never been temporally aligned in their desire to arbitrate.  *See MZM Constr'n Co.*, 974 F.3d at 402.  While the parties may challenge the underlying Agreement's enforceability in subsequent proceedings, to bring such a challenge to arbitration, they must first establish the Agreement from which the right to arbitration arises.  Assuming the Court finds an enforceable agreement to arbitrate, it must then address Defendants' claim that judicial estoppel and/or waiver requires this action to remain in federal court.

Third-Party Defendants emphasize that, "at the time this action was filed," they "were in fact participating in the arbitration," even if Wilkinson had previously attested that "[he] never agreed on behalf of MPL or [himself] to arbitrate any disputes with Mr. Dyevich."  (Doc. 66 at 8.)  Third-Party Defendants thus seem to suggest that, because they previously participated in arbitration based on Defendants' invocation of the arbitration clause, they should be allowed to resume those proceedings pursuant to the Agreement.  But without a clearly formed agreement to arbitrate, the Court may not compel arbitration.  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  Because material facts remain in dispute, the Court does not have a contractual basis at this time to render a Report and Recommendation on the pending motions to compel arbitration.

## Conclusion

As explained above, the Court cannot determine at this time that the parties intended to form the Royalty Agreement containing the arbitration clause at issue.  The parties' submissions

---

[7]  Over the course of this federal litigation, WCW has claimed that, because arbitration "is a matter of contract," the company "cannot be required to submit to arbitration," since it "has not agreed to so submit."  (Doc. 31 at 3 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)); *see* Doc. 1 at 4, ¶ 34 ("This Court may determine the question of arbitrability and should determine that WCW, Inc. is not subject to any alleged arbitration clause.").)

do not contain facts demonstrating mutual assent to the material terms of the Agreement.  It is unclear when Third-Party Defendant John Wilkinson held any position in WCW, Inc.; whether Wilkinson signed the Agreement; or which parties agreed to the handwritten deletions within the Agreement.  The present record also does not establish who had actual authority to act on WCW's behalf at the time the Agreement was executed.  Factual detail is lacking to demonstrate a course of dealing between a principal of WCW and Defendants such that Defendants reasonably relied on Wilkinson's apparent authority to enter the contract on behalf of WCW.  Relatedly, the Court cannot discern who from WCW may have ratified the Agreement, as it is unclear whether there was a WCW principal "fully informed of what [Wilkinson] did," *Reibman*, 164 A.3d at 1090, when he apparently signed the Agreement and WCW made royalty payments to Dyevich.

Accordingly, the Court reserves judgment pending further proceedings on WCW's Motion for Arbitration and Third-Party Defendants' Motion to Compel Arbitration.  (Docs. 60, 61.)  Those proceedings shall include development of the factual record pertinent to the issues identified in this Order, as well as supplemental briefing in light of the developed record.

The Court requests that the clerk set a status conference in this matter within two weeks of the date of this Order.  At the status conference, the Court will discuss with the parties the development of the record, including the scheduling of an evidentiary hearing, if necessary.

Dated at Burlington, in the District of Vermont, this 6th day of June 2022.

/s/ Kevin J. Doyle
Kevin J. Doyle
United States Magistrate Judge

21