UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

WCW, Inc.,

     Plaintiff,

     v.

Atlantis Industries, Inc. and
Kevin Dyevich,

     Defendants / Counterclaimants /
     Third-Party Plaintiffs,

     v.

M.P.L., Ltd., Bahamas; M.P.L., Inc., Belize;
John M. Wilkinson; and WCW, Inc.,

     Third-Party Defendants /
     Counterclaim Defendants.

Civil Action No. 5:19-cv-243

## REPORT AND RECOMMENDATION
(Docs. 60, 61)

Before the Court are WCW, Inc.'s Motion to Invoke Arbitration and Third-Party

Defendants/Counterclaim Defendants'—M.P.L., Ltd., Bahamas, M.P.L., Inc., Belize, and John

M. Wilkinson[1]—Motion to Compel Arbitration.  (Docs. 60, 61.)  Third-Party Defendants and

WCW assert that the 2001 Royalty Agreement at the center of this dispute is unenforceable, but

the Court may nevertheless compel arbitration because the arbitration clause contained in the

Royalty Agreement is severable from the remainder of the agreement.  (*See* Doc. 100 at 10.)

---

[1] The Court notes that Wilkinson was sued under the name "John M. Wilkinson" but testified at the evidentiary hearing in November 2022 that his full name was John W. Wilkinson.  (*See* Doc. 97 at 39:25.)  The Court refers to him as John W. Wilkinson or Wilkinson throughout this Report and Recommendation.  The Court refers to Jeffrey Wilkinson, the President of WCW, by his full name.

Defendants Kevin Dyevich and Atlantis Industries, Inc. argue that the Royalty Agreement is an enforceable contract but Third-Party Defendants and WCW have waived their right to arbitration, or alternatively, are now judicially estopped from enforcing that right by their conduct over the course of this protracted dispute. (*See* Doc. 62 at 5, 10.) On June 6, 2022, the Court issued an Order identifying several issues it sought to clarify regarding the enforceability of the Royalty Agreement and the parties' entitlement to arbitration. (Doc. 72.) The Court conducted an evidentiary hearing over two days in November 2022 (*see* Minute Entries, ECF Nos. 95, 98), after which the parties filed supplemental memoranda (Docs. 100, 101).

For the reasons set forth below, I recommend that Third-Party Defendants' Motion to Compel Arbitration (Doc. 60) and WCW's Motion to Invoke Arbitration (Doc. 61) be DENIED.

## Background[2]

In a January 14, 2021 Order on WCW's Motion to Dismiss Counterclaims, Chief Judge Crawford summarized "the broad outlines of the parties' conflict." (Doc. 51 at 3.) This Order assumes familiarity with the comprehensive factual background in the January 2021 Order and June 2022 Order, as supplemented by the testimonial and documentary record developed during the evidentiary hearing held on November 16 and 18, 2022.

### I.    Origins of the Dispute

The contract claims in this case originally arose "between John Wilkinson, an inventor and manufacturer of a new style of mattress, and Kevin Dyevich, a wholesale vendor of mattresses." (*Id.*) When the two met in 1994, Dyevich believed that Wilkinson was CEO and

---

[2] In the June 6, 2022 Order, the Court identified the legal and factual issues requiring further development before the Court could recommend a disposition on the pending requests for arbitration. (Doc. 72.) To provide necessary context for the disputed issues and to facilitate District Court review of any objections by the parties, the Court reiterates portions of its June 6, 2022 Order in Parts I–IV of the Background section of this Report and Recommendation. Part V summarizes the testimonial and documentary record developed during the evidentiary hearing held on November 16 and 18, 2022.

owner of WCW, Inc., a mattress manufacturing company. (Doc. 18 at 4, ¶ 1.) Wilkinson introduced Dyevich to a mattress design with patented "Self-Adjusting Technology" (SAT) (*id.* at 5, ¶ 5; Doc. 36 at 2, ¶ 5), and Dyevich helped sell mattresses containing this design to the New York metropolitan area medical marketplace (Doc. 18 at 5, ¶ 8). To encourage further sales, Dyevich and WCW engaged with Kinetic Concepts, Inc. (KCI), a prominent mattress distributor, for which WCW agreed to manufacture mattresses. (*Id.* at 6, ¶ 11; Doc. 36 at 3–4, ¶ 11; Doc. 56 at 2, ¶ 11.) Dyevich alleges that, in January 2000, he entered into a licensing agreement with WCW and KCI governing the proceeds of the mattress sales. (Doc. 18 at 6, ¶ 14.) WCW states, however, that it entered into an agreement with only KCI. (Doc. 56 at 3, ¶ 14.)

A Royalty Agreement (Agreement) related to the "M.P.L. License Agreement"—which governed rights in "SAT Products"—was then executed in April 2001. (Doc. 60-3 at 3, 8.) The preamble of the Agreement listed as parties Atlantis Industries, Inc. (of which Dyevich was president), WCW, Wilkinson, and MPL, Ltd., Bahamas (Wilkinson's offshore company, which later became MPL, Inc., Belize). (*Id.* at 2; *see* Doc. 18 at 6, ¶¶ 12, 16; Doc. 36 at 4, ¶ 12; Doc. 56 at 2, ¶ 12.) As the Court observed in its January 2021 Order:

> In several of the terms[,] the typewritten text is altered with handwritten markings and initials in the margin. One definition (regarding affiliates) is completely stricken, and John Wilkinson's and Kevin Dyevich's handwritten initials are in the margin. In five instances, the typewritten phrase "WCW" is stricken[,] and in four of those instances[,] it is replaced with the handwritten phrase "MPL." Only John Wilkinson's initials appear next to those alterations.

(Doc. 51 at 9 (citation omitted).)

The Agreement provides that Dyevich is entitled to receive one-third of the royalties from sales of the SAT Products. (Doc. 60-3 at 2.) The Agreement also contains the following arbitration clause:

> If a dispute arises between the parties to this Agreement for any reason, even if the dispute involves the interpretation and/or validity of this Agreement, all said such disputes shall be resolved by way of arbitration. The Rules of Arbitration shall be that of the American Arbitration Association Commercial Arbitration Rules. There shall be a selection of one arbitrator that has a legal degree that will be responsible for arbitrating all issues. The arbitrator shall be bound by the exact terms of this Agreement and the plain meaning and language of the interpretation of this Agreement. The arbitrator must follow all of the Rules and Regulations of the Court of the State of New Jersey, the arbitration must be held in the State of New Jersey and the arbitrator must follow all of the common and/or statutory laws that may be in effect as of the date of this Agreement up through the time of any dispute and decisions.
>
> The cost of the arbitrator shall be borne equally amongst the parties. The arbitrator will have at his or her discretion, an ability to award legal fees to either side if the arbitrator deems any claims and/or defenses are without <u>reasonable</u> merit.
>
> The decision of the arbitrator shall be final and not appealable.

(*Id.* at 6, ¶ 10.) No party disputes that, after the Agreement's execution, WCW made several payments to Atlantis Industries. (Doc. 18 at 11, ¶ 55; Doc. 36 at 9, ¶ 50; Doc. 56 at 6, ¶ 55.)[3] However, those payments ended in 2004. (Doc. 18 at 11, 12, ¶¶ 56, 59; Doc. 56 at 6–7, ¶¶ 56, 59.) According to Defendants, WCW promised Dyevich for several years that payments would resume, but WCW made no further payments to him or Atlantis Industries. (Doc. 18 at 9, ¶¶ 38–39.)

## II.    Previous Arbitration Efforts

In 2009, Dyevich commenced arbitration against WCW, MPL, and Wilkinson pursuant to the terms of the Agreement. (*Id.* ¶ 39; Doc. 56 at 5, ¶ 39.) In total, Dyevich took the Agreement's alleged parties to arbitration on three separate occasions. (Doc. 36 at 15, ¶ 92; Doc. 40 at 4, ¶ 24.) On the first attempt, he ended arbitration proceedings after he and several of his affiliates entered into a General Release with WCW, MPL, and Wilkinson. (Doc. 1 at 3,

---

[3]  As explained below, WCW and Atlantis Industries/Kevin Dyevich dispute the nature of the payments, i.e., whether they were royalty payments.

¶ 17; Doc. 18 at 2, ¶ 17; Doc. 36 at 13, 14, ¶¶ 80, 82; Doc. 40 at 3, ¶¶ 12, 14.)  Dyevich again brought the same claim in arbitration in 2013, but he ultimately abandoned proceedings.  (Doc. 36 at 14, ¶ 83; Doc. 40 at 3, ¶ 15.)  When he sought arbitration a third time in late 2018, WCW requested that the arbitrator dismiss the proceedings.  (Doc. 1 at 2, ¶ 8; Doc. 18 at 2, ¶ 8; Doc. 36 at 14, ¶ 84; Doc. 40 at 3, ¶ 16.)

WCW asserted several bases for dismissal of arbitration proceedings in 2018.  First, WCW contended that it was not a party to the Royalty Agreement.  (Doc. 1-2 at 6–7.)  WCW asserted that there was no "meeting of the minds" between WCW and Atlantis Industries because WCW was "deleted" from the Agreement, and the Agreement was not signed by an officer authorized to bind WCW.  (*Id.*)  Second, WCW claimed that Dyevich failed to disclose his right to royalty payments during bankruptcy proceedings in 2000.  (*Id.* at 8–9.)  In WCW's view, therefore, the alleged royalty rights had become an asset of the bankruptcy estate that Dyevich could not pursue in arbitration.  (*Id.* at 9–10.)  Third, WCW contended that New Jersey's six-year statute of limitations for contract claims barred Dyevich's claim that he was owed royalty payments fourteen years after WCW allegedly made its last payment in 2004.  (*Id.* at 11–14.)  Finally, WCW argued that Atlantis Industries lacked standing to compel arbitration because the corporate entity no longer existed, according to a statement Dyevich purportedly made during a deposition in prior federal litigation in the Northern District of New York.  (*Id.* at 15–16.)

Before the arbitrator ruled on the motion, WCW filed its Complaint in federal court to enjoin further arbitration.  (Doc. 1 at 2, 4, ¶¶ 8, 24.)

## III.    WCW Files Its Complaint in This Court and Arbitration Is Stayed

WCW's Complaint requested declaratory and injunctive relief against both Atlantis Industries and Dyevich.  (*Id.* at 1.)  WCW alleged that Atlantis Industries had commenced arbitration against WCW, MPL, and Wilkinson based on the terms of a Royalty Agreement

between the parties.  (*Id.* at 1–2, ¶¶ 5, 6, 12.)  WCW sought a declaration from the Court that it was not a party to the Agreement and an injunction restraining Atlantis Industries from prosecuting any claims against WCW in arbitration.  (*Id.* at 5, ¶ 36.)

Tracking several of the bases it asserted to dismiss arbitration proceedings in 2018, WCW's Complaint articulated several reasons for its entitlement to relief.  First, WCW asserted that WCW was not a named party to the contract because its name was crossed out in the Agreement during negotiations.  (*Id.* at 2–3, ¶¶ 14–15.)  WCW further alleged that Dyevich and his affiliated companies had entered into a 2009 agreement with WCW "to resolve all issues that involved any agreements between the parties."  (*Id.* at 3, ¶ 17.)  Finally, WCW asserted that, during bankruptcy proceedings in 2000, "Dyevich did not list Atlantis Industries, Inc. or the Royalty Agreement as possible assets of the debtor" (*id.* ¶¶ 19–20), apparently suggesting that Dyevich and/or Atlantis Industries could not possess an interest in the Agreement.

Dyevich and Atlantis Industries filed an Answer and Counterclaims, as well as a Third-Party Complaint, against WCW, the MPL entities, and Wilkinson.  (Doc. 18.)  According to Defendants, these counterclaims essentially mirror the claims they brought in arbitration.  (Doc. 63 at 3.)

WCW sought dismissal of these counterclaims on the same grounds that it asserted to dismiss the 2018 arbitration.  (Doc. 27.)  For example, WCW disputed that it had formed an agreement to make royalty payments because the parties had no "mutual intent to be bound by the terms and conditions of [the] agreement."  (*Id.* at 6.)  The company reasoned that it had no intent to be bound because "WCW" had been crossed out in the payment provision and the royalty definition.  (*Id.*)  WCW further contended that Wilkinson had neither actual nor apparent authority to act on WCW's behalf when the agreement was executed.  (*Id.* at 6–7.)  WCW

alleged that Wilkinson was not an owner or officer of the company, and WCW had not manifested an intent for Wilkinson to act on the company's behalf. (*Id.*)

Defendants replied that the "obviously disputed facts" prevented the Court from deciding these issues on a motion to dismiss. (Doc. 32 at 3.) According to Defendants, Wilkinson's representations—both when signing the Agreement and providing royalty payments for a period of years thereafter—and the parties' long course of dealing conflicted with WCW's assertion that he lacked authority to enter into the Agreement on behalf of WCW. (*Id.*) Regardless of whether Wilkinson had that authority, Defendants contended that WCW had ratified the Agreement by making royalty payments to Dyevich. (*Id.* at 4.) Defendants also argued that the parties' intentions behind manually deleting certain terms within the Agreement could not be decided at the motion-to-dismiss stage. (*Id.* at 4–5.)

In the January 14, 2021 Order denying WCW's Motion to Dismiss, Chief Judge Crawford observed that it is "difficult to discern any relevant conduct undertaken by WCW independent of Wilkinson's conduct." (Doc. 51 at 26.) The Court further observed that the allegations plausibly supported a ratification theory whereby WCW's "payment of nearly half a million dollars in royalties after Wilkinson signed the Royalty Agreement would amount to a significant failure to repudiate what, in WCW's view, was Wilkinson's unauthorized act of signing the Royalty Agreement." (*Id.* at 27.) As to whether WCW should be deemed a party to the Agreement, the Court could not decide, solely based on the pleadings, the effects of the crossed-out references to WCW in the Agreement's material terms. (*Id.* at 27–28.) The Court noted that "neither [party] seeks arbitration," relying on the parties' "mutual albeit implicit consent," and continued the stay of arbitration in favor of resolving "the issues raised in the counterclaim and other remaining claims through litigation in this forum." (*Id.* at 28–29.) The

Court further held that "[t]he final judgment order will reflect the parties' agreement that neither seeks to enforce the arbitration clause in the Royalty Agreement." (*Id.* at 29.)

At a February 2021 status conference, WCW asserted that it had not waived any right to arbitration. (Doc. 61 at 2.) The Court then ordered that any party intending to invoke a right to arbitration must do so by March 15, 2021. (Doc. 58 at 1, ¶ 1; Doc. 61 at 2.)

## IV.    WCW and Wilkinson/MPL Entities Seek to Compel Arbitration

On March 8, 2021, WCW and Third-Party Defendants filed their Motions to compel arbitration. (Docs. 60, 61.) According to WCW, although it is not a party to the alleged Royalty Agreement, it should not have to select litigation or arbitration until the Court has declared WCW's status under the Royalty Agreement. (Doc. 61 at 2.) Nevertheless, WCW asserts that "[t]he Royalty Agreement contains a broad arbitration clause," and it invokes that clause to return the parties' dispute to arbitration. (*Id.* at 1, 3.) Defendants countered that WCW's commencement of this federal action and its course of conduct were plainly inconsistent with an intent to arbitrate. (Doc. 63 at 2.) Accordingly, Defendants reason that WCW has waived its right to arbitrate at this late stage. (*Id.* at 5–10.)[4] WCW replies that there is a "strong presumption in favor of arbitration" and denies that the filing of its federal Complaint acts as a waiver of arbitration. (Doc. 65 at 2, 3.)

Wilkinson and the MPL entities separately contend that "the arbitration provision in the Royalty Agreement clearly constitutes an agreement to arbitrate between at least Third-Party Defendants and the Defendants/Third-Party Plaintiffs." (Doc. 60-1 at 6.) They also note that the matter was already in arbitration when WCW suspended proceedings by bringing the action to

---

[4] Defendants argued at an August 2021 hearing before the undersigned that judicial estoppel prohibits both WCW and Third-Party Defendants from compelling arbitration. (Minute Entry, ECF No. 69.)

federal court. (*Id*. at 8.) Defendants assert that waiver and judicial estoppel also foreclose arbitration as to Wilkinson and the MPL entities. (Doc. 62.) But Wilkinson and the MPL entities contend that Defendants have failed to meet the legal standard for application of either doctrine. (Doc. 66.)

## V.    Evidentiary Hearing

In anticipation of an evidentiary hearing, the Court identified certain legal and factual issues that precluded a recommended disposition on the motions to compel arbitration without further development. Concluding that any right to enforcement of the arbitration clause depended on whether the parties legally formed the Agreement containing the arbitration clause, the Court focused on contract formation issues. Specifically, the factual record was insufficient as to (1) whether the parties mutually assented to the terms of the Agreement; and (2) whether the contract should be enforced based on principles of apparent authority or ratification. (Doc. 72 at 14.) Finally, the Court questioned whether it was possible to sever an arbitration clause from a contract that was never actually formed and enforce the arbitration clause standing alone.

The Court conducted an evidentiary hearing to develop the record on these issues. WCW called as witnesses WCW President Jeffrey Wilkinson and John W. Wilkinson, who is Jeffrey Wilkinson's father, the founder of MPL, and Chairman of WCW's Board of Directors. Kevin Dyevich testified on behalf of himself and Atlantis Industries.

### A.    Testimony of Jeffrey Wilkinson

Jeffrey Wilkinson testified that WCW was incorporated in Vermont in 1992. (Doc. 97 at 7:22–24; Doc. 94-1.) According to the incorporation documents, the original shareholders of WCW were Jeffrey Wilkinson, John C. Wilkinson (Jeffrey Wilkinson's brother), and Jean Silverman (Jeffrey Wilkinson's stepmother). (Doc. 94-1 at 4; Doc. 97 at 8:3–10.) John W.

Wilkinson had never been a shareholder or corporate officer of WCW since its inception. (Doc. 97 at 8:16–21; *see also* Doc. 94-2 (stock ledger documenting shareholders between 1992 and 1995 consisted of the original shareholders and Carla Bellemare, Jeffrey Wilkinson's sister)). John W. Wilkinson was a member of WCW's Board of Directors (Doc. 97 at 9:22–25, 10:10–12) and had served as Chairman of the Board of Directors since 1997 (*id*. at 35:22–24). WCW was a family company, and Jeffrey Wilkinson, John C. Wilkinson, and Carla Bellemare were responsible for day-to-day operations. (*Id*. at 10:13–20.) Jeffrey Wilkinson suggested that John W. Wilkinson was not as involved on a daily basis with WCW's operations. (*Id*.)

WCW issued seven checks to Atlantis Industries between 2000 and 2004. (Doc. 94-5; Doc. 93-2.) The checks totaled $479,268.43. Jeffrey Wilkinson appears to have signed four of the checks and Jean (Silverman) Wilkinson signed one check. The signature on two of the checks is illegible. (*Id*.) The separation forms associated with three of these checks contain variations on the word "ROYAL." (*See, e.g.*, Doc. 26-2; Doc. 93-2 at 2 (August 8, 2000 check with associated notation "ROYAL"); *id*. at 3 (December 20, 2000 check with associated notation "ROYAL 2"); Doc. 94-5 at 2 (March 4, 2004 check with associated notation "ROYAL/04").) The remaining four checks do not contain similar notations. The table below depicts the relevant information associated with each check:

| Date | Amount | "Royal" Notation | Signature |
|---|---|---|---|
| June 21, 2000 | $9,000 | | Illegible |
| August 8, 2000 | $15,655 | Yes | Illegible |
| December 20, 2000 | $10,000 | Yes | Jean Wilkinson |
| January 31, 2001 | $30,000 | | Jeffrey Wilkinson |
| February 12, 2002 | $137,770 | | Jeffrey Wilkinson |

| April 21, 2003 | $124,244 | | Jeffrey Wilkinson |
|---|---|---|---|
| March 4, 2004 | $152,599.43 | Yes | Jeffrey Wilkinson |

Jeffrey Wilkinson offered an explanation as to why WCW sent these checks to Dyevich/Atlantis Industries in the absence of any contractual obligation. To the best of his recollection, WCW sent the checks to Atlantis Industries at the request of his father, John W. Wilkinson. (Doc. 97 at 14:20–15:4.) WCW was undergoing expansion in the 1999–2000 timeframe and John W. Wilkinson was regularly loaning money to WCW to facilitate the company's growth after its recent business deal with KCI. (*Id*. at 11:19–24, 29:21–30:2.) Minutes from shareholder meetings during that timeframe document that John W. Wilkinson and/or his company MPL were loaning money to WCW. (Doc. 94-4 at 43 (1999 meeting minutes recording that John W. Wilkinson would continue loans to WCW "to fund the ongoing expansion"); *id*. at 48 (2000 meeting minutes recording John W. Wilkinson's agreement to WCW "borrowing more money from MPL").) WCW and John W. Wilkinson/MPL had no formal agreement as to how WCW would re-pay the loans. (Doc. 97 at 13:14–18.) Jeffrey Wilkinson surmised that his father may have had some type of financial agreement with Atlantis Industries. According to Jeffrey Wilkinson, his father likely asked him to direct WCW's payments on the MPL loans to Atlantis Industries to satisfy the financial obligation that John W. Wilkinson may have had with Atlantis Industries. (*Id*. at 15:3–9.)

Jeffrey Wilkinson had not seen the Royalty Agreement at the time it was signed in 2001. (*Id*. at 16:25–17:11.) He recalled first seeing the document around the time that the parties began arbitration proceedings, which he estimated occurred in 2013.[5] He acknowledged that the

---

[5] It appears that the first arbitration occurred in 2009. (Doc. 18 at 9, ¶ 39; Doc. 56 at 5, ¶ 39.)

signature on the Royalty Agreement on behalf of WCW appeared to be John W. Wilkinson's, but

he thought it was questionable. (*Id*. at 17:23–25.) John W. Wilkinson did not have authority to

sign contracts on behalf of WCW, sign checks in WCW's name, or otherwise bind WCW in any

way. (*Id*. at 10:21–11:3.)

### B.    Testimony of John W. Wilkinson

Wilkinson testified he has never been an officer or shareholder of WCW. (*Id*. at 40:19–

41:2.) His company MPL frequently loaned WCW money to grow the business. (*Id*. at 41:19–

22.) WCW and MPL did not memorialize these lending arrangements in the form of promissory

notes or other loan documents. (*Id*. at 41:23–25.)

Wilkinson did not recall conversations with Dyevich in which they explicitly discussed

Wilkinson's role at WCW, nor did Wilkinson recall Dyevich inquiring about Wilkinson's role in

WCW. (*Id*. at 42:20–43:5.)

Wilkinson had "agreements or understandings" with Kevin Dyevich, but they were all

"verbal." (*Id*. at 43:8–13.) One of these verbal understandings involved Dyevich receiving

royalty payments. Wilkinson could not remember the specific terms of that understanding, but

he recalled that MPL paid royalties "through WCW." (*Id*. at 43:16–20.) Wilkinson

acknowledged that Dyevich "was going to share in some of the royalty stream" from MPL and

WCW's agreement with KCI, but he denied that the royalty agreement was reduced to writing.

(*Id*. at 44:1–12.)

When asked about his signature on the Royalty Agreement, Wilkinson acknowledged his

signature, but denied that he signed the Agreement on behalf of WCW:

> This appears to be my signature. I'm not denying the signature. But I never signed
> it on behalf of WCW. I may have signed it in the wrong place. But I think the
> intent here was to have a royalty agreement with MPL, not WCW, and that's why

'WCW' was crossed out throughout this document, because Kevin [Dyevich] understood that the royalty agreement wasn't with WCW, it was with MPL.

(*Id*. at 45:20–46:4.)  Wilkinson had no recollection of signing the Agreement.  (*Id*. at 48:4–7.)

### C.    Testimony of Kevin Dyevich

Dyevich testified that he became involved with WCW in 1994 when he called WCW to inquire about initiating a business relationship.  (Doc. 99 at 9:13–21.)  Dyevich stated that "[a] gentleman by the name of Jeff Wilkinson answered the phone, and he passed along the information to his father, and I believe his father called me back shortly thereafter."  (*Id.* at 9:22–24.)  According to Dyevich, he and Wilkinson had an initial business meeting shortly after that phone call, which "led to an oral understanding, an oral partnership, whereby WCW was going to manufacture" mattresses for Atlantis Medical.  (*Id.* at 10:8–12.)  Dyevich and Wilkinson had a relationship that "unfolded beautifully" and they "had initial success right out of the gate."  (*Id.* at 10:17–18.)  Specifically, "[e]very year that [they] were in a relationship businesswise with each other, [they] did many millions of dollars in sales that [they] both participated in as a distributor and as a manufacturer."  (*Id.* at 10:20–22.)

When asked about the formation of the Agreement, Dyevich explained:

[T]here's four entities involved in the signature and memorializing this document: one being Atlantis Industries, the Bahamian company, which I signed as president; the others being John Wilkinson signing as chairman of WCW, Inc., out of Vermont; the other party would be Howard Lawrence, which is one of the directors of MPL Bahamian company; and finally, John Wilkinson signed individually.

(*Id.* at 14:1–7.)  To explain why there was not a signature line for John W. Wilkinson individually, Dyevich stated:

The attorney that drafted this contract failed to print John Wilkinson's name on the signature page, so when I drove up to New York state, Hoosick Falls, in 2001 to meet with John for his signature, I pointed it out to him.  So he took the liberty of writing in his name, and then he signed his name, his signature, under his name, which codified himself individually agreeing to the—to this particular contract.

(*Id.* at 14:17–24.) Dyevich then explained the circumstances of the execution of the Royalty

Agreement:

> [DYEVICH:] So I physically signed it in the state of New Jersey as president on February 26, 2001. I called John and I asked him whose signature will be in a place for MPL. He directed me to send this contract down to the Bahamas. And the—the director, the first director, who I'm very familiar with, Howard Lawrence, signed it in the Bahamas, and he sent the contract back to me in April 2001.
>
> When I received it back, I let John know. I called him up; I made arrangements to meet with him personally, which we did, and we—
>
> [DAVID BOND:] Where?
>
> [DYEVICH:] In Hoosick Falls, New York.
>
> . . . .
>
> [DYEVICH:] So I sat down with John on February 25, 2001; we reviewed the contract; John wanted to make some revisions; I only agreed to one revision.
>
> [BOND:] What was that?
>
> [DYEVICH:] It's—it's paragraph number 2. It is called "AFFILIATE." So when John initialed it, I initialed it and I said I could agree to that. And that's the only thing that I could agree to in terms of him trying to make revisions to this contract.

(*Id.* at 15:16–16:15.) Regarding the other revisions to the contract, Dyevich stated:

> He reviewed it in front of me. We discussed it. We discussed every paragraph. So as he was reviewing it, he was making revisions to cross out WCW parties to only-–only to recognize MPL, and I said to John, I said, John, I cannot agree with that, because MPL, as you know and I know very well—I'm confirming that MPL is just a shell company. It's just like—the only asset that it has is whatever you direct the patents that are held on behalf of MPL, whoever might—might hold it. So the intellectual property could be transferred at any given moment. So MPL is just a shell company that's actually worthless unless it's holding intellectual property of some value.

(*Id.* at 16:18–17:4.) Regarding the final executed form of the contract, Dyevich testified:

> [A]fter discussing this, [Wilkinson] agreed that we can move forward and he could go ahead and sign the contract in its entirety under that understanding, and it's all recognized here, because I didn't initial anything other than that paragraph number 2.

(*Id.* at 17:5–9.)

With respect to his past dealings with WCW, Dyevich noted he "only had one contact in the [fourteen] years that [he] dealt with WCW, and that was John W. Wilkinson." (*Id.* at 23:5–6.)  When asked about his receipt of the royalty payments prior to the Royalty Agreement's execution in 2001, Dyevich explained:

> So as John W. Wilkinson alluded to in his testimony, we had a very close relationship.  So when the KCI agreement was consummated in the year 2000, I came on board. . . . WCW started receiving checks in 2000, and they started cutting checks to Atlantis Industries, the one third, in 2000.  And that was under an oral understanding, an oral agreement, an oral contract.  And when the attorney in New Jersey memorialized that oral understanding into a written contract, that's when I––I signed it; I had Howard Lawrence sign it on behalf of MPL; and I drove up to New York, Hoosick Falls, New York, to have John sign it in 2001.

(*Id.* at 25:24–26:10.)

As a result of this agreement, Dyevich confirmed that "WCW paid Atlantis somewhere over $500,000 in royalties between 2000 and 2004." (*Id.* at 26:11–12.)

### D.    Post-Hearing Memoranda

The parties submitted post-hearing memoranda clarifying their legal arguments in light of the developed factual record.  Third-Party Defendants and WCW contend that: (1) Kevin Dyevich and Wilkinson did not have a mutual meeting of the minds as to the material terms of the Agreement; (2) even if Wilkinson signed the Agreement on behalf of WCW, he lacked actual authority to bind WCW to the contract; (3) Defendants cannot show that they reasonably relied on Wilkinson's apparent authority to bind WCW; (4) WCW did not ratify the Agreement; (5) this Court should send this case to arbitration even if it determines that the Agreement is not a valid contract, because the arbitration provision is severable and enforceable from the remainder of the contract; (6) WCW and Third-Party Defendants did not waive their right to arbitration;

and (7) MPL's assignment of its patent rights to WCW[6] is of little relevance to the dispute before this Court because the Royalty Agreement is not enforceable to bind WCW to its terms. (Doc. 100.)

Defendants argue that Wilkinson: (1) had actual or apparent authority to enter into the Agreement on behalf of WCW; (2) WCW ratified the Agreement by making royalty payments to Defendants; (3) WCW became party to the Agreement when MPL assigned all "MPL Technology" to WCW; and (4) even if this Court determines there was not a meeting of the minds, this represents a factual dispute that precludes the Court from ordering the parties to arbitrate. (Doc. 101.)

## Discussion

### I.    Contract Formation

### A.    Legal Standard

Under the Federal Arbitration Act (FAA), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of [the] contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Until a recent change in the law, as discussed below, the FAA represented "a liberal federal policy favoring arbitration agreements," and its effect "is to create a body of federal substantive law of arbitrability, applicable to any arbitration

---

[6] On September 17, 2014, MPL and WCW entered into an assignment agreement, in which MPL transferred and assigned "all right, title and interest in and to all MPL Technology" to WCW. (Doc. 93-10.) The assignment agreement specifies that "MPL Technology" is "to be construed broadly," and includes, without limitation:

> [I]nventions, information, technical data, plans, drawings, specifications, prototypes, models, practices, manufacturing processes, quality control procedures, design history files, master device records, trade secrets, know-how, research protocols, clinical studies, marketing materials, instructions, manuals, FDA registrations, exemptions and notifications, regulatory filings, test results, UL listing files, TUV registrations, copyrights, *contractual rights*, licenses, trade dress, trademark rights, and other forms of intellectual property, and all related files, information and documentation.

(*Id.* (emphasis added).)

agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, "the FAA's policy favoring arbitration does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (internal quotation marks omitted). The FAA simply "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation omitted).

To this end, the FAA "does not require parties to arbitrate when they have not agreed to do so." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)). "Thus, before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017). "The question of whether the parties have agreed to arbitrate . . . is an issue for judicial determination . . . ." *Nicosia*, 834 F.3d at 229. In deciding whether the parties have agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

When deciding a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia*, 834 F.3d at 229 (internal quotation marks omitted). This standard requires a court to consider "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, . . . and draws all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (omissions in original) (internal quotation marks omitted). Accordingly, "[w]hen moving to compel arbitration, '[t]he party seeking . . .

arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made.'" *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (second alteration and omissions in original) (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order)). At this initial stage, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal quotation marks omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

The party resisting a motion to compel arbitration, must place in issue the facts surrounding the formation of an arbitration agreement. However, "it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). "If the party seeking arbitration has substantiated the entitlement [to arbitration] by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Id.* Accordingly, the motion to compel may be granted "[i]f undisputed facts in the record require[] the issue of arbitrability to be resolved . . . as a matter of law." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

However, "[i]f there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Id.* (citing 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.")). The FAA provides that "the court shall hear and determine such issue." 9 U.S.C. § 4. The party opposing arbitration

may request a jury trial on the issue of the making of the arbitration agreement. *Id.*[7]  Courts

require the party opposing arbitration to make its jury trial demand "on or before the date set by

the district court for the filing of any opposition to the request to arbitrate."  *Rodriguez-Rivera v.*

*Allscripts Healthcare Sols., Inc.*, CIVIL NO. 18-1076 (DRD), 2023 WL 4196909, at *3 (D.P.R.

June 27, 2023); *see Ayad v. PLS Check Casher of N.Y., Inc.*, 20 CV 01039 (CBA) (CLP), 2021

WL 4756091, at *9 n.12 (E.D.N.Y. July 26, 2021) (finding jury trial appropriate because

plaintiff requested jury trial on "all issues of fact concerning the purported arbitration agreement,

including but not limited to all issues of material facts concerning the formation of the purported

arbitration agreement" in memorandum in opposition to motion to compel (quoting ECF No. 21

at 13)), *report and recommendation adopted as modified*, 2021 WL 4272472 (E.D.N.Y. Sept. 21,

2021); *NATS, Inc. v. Radiation Shield Techs., Inc.*, Civil No. 3:21-cv-430(AWT), 2022 WL

1619687, at *1 (D. Conn. Feb. 18, 2022) (rejecting plaintiff's request for jury trial where plaintiff

"ha[d] not made any demand for a jury trial on the issue of the creation of an arbitration

agreement either in its complaint or since the court's determination that 'it is necessary to hold a

trial on the issue of making an agreement to arbitrate'" (quoting ECF No. 39)); *Reiterman v.*

*Abid*, 26 F.4th 1226, 1233 (11th Cir. 2022) (rejecting plaintiff's entitlement to jury trial where

one was not requested and court conducted evidentiary hearing); *Burch v. P.J. Cheese, Inc.*,

861 F.3d 1338, 1349 (11th Cir. 2017) (finding that "Section 4 is far from 'silent' on the

mechanisms required to invoke the statutory right to a jury trial that it provides, [and thus] its

procedures displace the general jury demand procedures provided in Federal Rule of Civil

---

[7]  In relevant part, the FAA provides:

If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.  If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue.

9 U.S.C. § 4.

Procedure 38").  The inclusion of a general jury demand in the complaint does not entitle a party

to a jury trial on the making of the arbitration agreement.  *See Burch*, 861 F.3d at 1349.[8]

If the opposing party does not demand a jury trial, the court may decide whether an

arbitration agreement has been formed.  "Court[s] have used the terms 'trial' and 'evidentiary

hearing' interchangeably in describing the hearing required by 9 U.S.C. § 4 where a showing of a

genuine issue of material fact is made."  *Ayad*, 2021 WL 4756091, at *3 n.2; *see de Moura

Castro v. Loanpal, LLC*, Civil Action No. 3:21-CV-01020 (CSH), 2022 WL 2315697, at *11 (D.

Conn. June 28, 2022) (ordering evidentiary hearing to determine whether a trial was necessary);

*De Jesus v. Gregorys Coffee Mgmt., LLC*, No. 20-CV-06305 (MKB) (TAM), 2022 WL 3097883,

at *1 (E.D.N.Y. Aug. 4, 2022) (granting motion to compel arbitration after evidentiary hearing);

*Solis v. ZEP LLC*, No. 19cv4230 (JGK), 2020 WL 1439744, at *1 (S.D.N.Y. Mar. 24, 2020)

(denying motion to compel arbitration after evidentiary hearing); *Galeana v. Mahasan Inc.*, No.

14-CV-3625 (VSB), 2019 WL 3024588, at *7 (S.D.N.Y. July 11, 2019) (deciding motion to

compel arbitration after evidentiary hearing).

When a court conducts an evidentiary hearing on a motion to compel arbitration, it may

assess witness credibility and make factual findings based on the hearing testimony and

documentary evidence.  *Barrows*, 36 F.4th at 54; *see Interocean Shipping Co. v. Nat'l Shipping

& Trading Corp.*, 523 F.2d 527, 534 (2d Cir. 1975) (affirming district court's decision to compel

arbitration where "[t]he court's findings were based in large measure on its resolution of issues

---

[8]  The unusual procedural posture of this case differs from perhaps the more typical course of proceedings where the right to arbitrate is in dispute.  WCW filed this action, in part, to obtain a declaration that it was not obligated to arbitrate.  Its more recent position is that the dispute should be returned to arbitration.  Dyevich and Atlantis Industries resist arbitration on waiver grounds, but they do not dispute the validity of the arbitration agreement.  In these circumstances, the "refusal to perform [arbitration is] in issue," 9 U.S.C. § 4, which would entitle Dyevich and Atlantis to "demand a jury trial of such issue," *id.*  However, Dyevich and Atlantis are not refusing to perform in the sense that they contest arbitrability, but rather assert that WCW has waived its rights to arbitration.  In any event, Dyevich and Atlantis have not demanded a jury trial as to the arbitration issue specifically.

of credibility with respect to witnesses called by both sides"); *Reiterman v. Abid*, Case No. 8:19-cv-02282-02AAS, 2020 WL 1282257, at *1 (M.D. Fla. Mar. 13, 2020) (denying motion to compel arbitration "based upon clear credibility findings"); *Victorio v. Sammy's Fishbox Realty Co.*, No. 14 Civ. 8678(CM), 2015 WL 2152703, at *3 (S.D.N.Y. May 6, 2015) (granting motion to compel arbitration after making "credibility findings as to the circumstances under which the [p]laintiffs signed [the] arbitration[] agreements").  When making credibility and factual findings, "the court must lift that thumb from the scales, evaluate the conflicting evidence even-handedly, and decide which side's account is more likely true."  *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 980 (10th Cir. 2014).

### B.    The Royalty Agreement Is An Enforceable Contract

#### 1.    Governing Law

"An agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law."  *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 312–13 (N.J. 2014) (internal quotation marks omitted).  Under New Jersey law,[9] "[a]n enforceable agreement requires mutual assent, a meeting of the minds based on a common understanding of the contract terms."  *Morgan v. Sanford Brown Inst.*, 137 A.3d 1168, 1180 (N.J. 2016); *In re Rappaport*, 517 B.R. 518, 530 (Bankr. D.N.J. 2014) ("A meeting of the minds occurs when there has been a common understanding and mutual assent to all the terms of a contract.").[10]

---

[9] Consistent with the terms of the Royalty Agreement, and without objection by the parties, the Court "applies New Jersey law to the parties' competing contract claims."  (Doc. 72 at 11 n.5.)

[10] A "material term" is "[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done."  *Black's Law Dictionary* (11th ed. 2019).  Similarly, an "essential term" is "[a] contractual provision that must be included for a contract to exist; a contractual provision that specifies an essential purpose of the contract, so that a breach of the provision through inadequate performance makes the performance not only defective but essentially different from what had been promised."  *Id.*

"Mutual assent requires that the parties have an understanding of the terms to which they have agreed." *Atalese*, 99 A.3d at 313. "[B]ecause arbitration involves a waiver of the right to pursue a case in a judicial forum, courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent." *Id.* (internal quotation marks omitted). Accordingly, "parties create an enforceable contract when they agree on its essential terms and manifest an intent that the terms bind them. If parties to an agreement do not agree on one or more essential terms of the purported agreement courts generally hold it to be unenforceable." *Baer v. Chase*, 392 F.3d 609, 619 (3d Cir. 2004) (internal citations omitted). "The key factor is not whether every detail normally associated with a contractual undertaking has been included in an agreement between the parties." *Cal. Nat., Inc. v. Nestle Holdings, Inc.*, 631 F. Supp. 465, 470 (D.N.J. 1986). "When looking for mutual assent, a court will take [the parties'] outward expressions and ask what meaning the words should have conveyed to a *reasonable person* cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances." *Pagnani-Braga-Kimmel Urologic Assoc., P.A. v. Chappell*, 968 A.2d 1242, 1245 (N.J. Super. Ct. Law Div. 2008) (internal quotation marks omitted). "Objective manifestations of intent are controlling when determining if there was a meeting of the minds." *Payer v. Berrones*, Civil No. 12–1704 (RMB/JS), 2015 WL 4715953, at *3 (D.N.J. Aug. 7, 2015). In the corporate context, an enforceable contract "must be proven to have been the act of the [company] either by corporate action, the act of an authorized agent, or by adoption and ratification." *Aerial League of Am. v. Aircraft Fireproofing Corp.*, 117 A. 704, 705 (N.J. 1922).

### 2.    Contract Analysis

The executed Agreement contains several handwritten modifications.  The paragraph defining "Affiliate" is entirely stricken and includes both John W. Wilkinson and Kevin Dyevich's initials in the margins.  (*See* Doc 1-1 at 5.)  In six instances, the typed term "WCW" is stricken by hand, and in four of those instances "WCW" is replaced by a handwritten "MPL."  (*Id.* at 6, ¶¶ 5, 6; *id.* at 7, ¶ 8.)  In the two instances where "WCW" was not replaced, MPL was already referred to in the same phrase.  (*See, e.g.*, *id.* at 6, ¶ 3 ("WCW Parties": Shall mean ~~WCW~~,[11] MPL, JOHN WILKINSON and/or any of the owners, stockholders, successors, assigns, affiliates, parents and/or subsidiaries thereto."); *id.* at 7, ¶ 8 ("This stock certificate and/or certificate of ownership is subject to a certain Royalty Agreement between Atlantis Industries, Inc., ~~WCW, INC.,~~ MPL and JOHN WILKINSON, their successors, assigns, parents, subsidiaries, stockholders, partners and owners.").)  In each instance where "WCW" is stricken from the Agreement, only John W. Wilkinson's initials—and not Kevin Dyevich's initials—appear in the margin next to the change.  (*See id.* at 6–7.)

Dyevich testified that Wilkinson reviewed the Agreement in front of him, and they "discussed every paragraph."  (Doc. 99 at 16:18–19.)  Regarding the strikeouts, Dyevich testified that "John [Wilkinson] wanted to make some revisions" but Dyevich "only agreed to one revision" pertaining to the paragraph entitled "Affiliate."  (*Id.* at 16:8–12.)  Dyevich explained that he and Wilkinson each initialed that paragraph because both men had agreed to that alteration.  (*Id.* at 16:12–13.)  This was "the only thing that [Dyevich] could agree to in terms of [Wilkinson] trying to make revisions to this contract."  (*Id.* at 16:13–14.)  Dyevich recalled that Wilkinson "was making revisions to cross out WCW parties to only . . . recognize MPL."  (*Id.* at

---

[11]  The Court uses ~~strikethrough~~ to indicate where the typed language was stricken by hand.

16:19–21.) Dyevich was unable to agree to this alteration because "MPL [was] just a shell company," and its only assets were the patents it held. (*Id.* at 16:23–25.) Dyevich testified that "the intellectual property could be transferred at any given moment," which meant that MPL was "actually worthless unless it's holding intellectual property of some value." (*Id.* at 17:1–4.) After Dyevich voiced this concern during the meeting, Wilkinson agreed that they could "move forward and he could go ahead and sign the contract in its entirety under that understanding." (*Id.* at 17:5–7.)

Dyevich's explanation for his reluctance to execute the contract without WCW as a party is credible, particularly given the Wilkinsons' testimony that MPL had a limited function. John W. Wilkinson acknowledged during his testimony that "MPL was a company that [he] formed for medical products licensing" for "technologies that [he] enjoyed patents on." (Doc. 97 at 41:5–6.) When asked what function MPL performed, Wilkinson stated only that "MPL licensed" and did not manufacture any of the technology it owned. (*Id.* at 41:8–12.) MPL was developing products and WCW was "manufacturing some of the products that [Wilkinson] developed and some of the products [he] enjoyed patents on." (*Id.* at 40:14–15.) Jeffrey Wilkinson confirmed that MPL "[l]icensed patents," but he gave no indication that MPL had additional capabilities. (*Id.* at 12:21–22.) The contemporaneous corporate minutes are consistent with Dyevich's understanding of MPL's limited function at the time the Royalty Agreement was executed. At the WCW shareholders meeting in 2002, "John W. reported that he ha[d] filed additional patents and once issued to MPL, will be licensed for use by WCW." (Doc. 94-4 at 61.) MPL's development of patents and WCW's use of MPL's patents were closely related.

The Court credits Dyevich's explanation of the initialing procedure as it pertains to which entities were the intended parties to the contract. *See Barrows*, 36 F.4th at 54 (remanding case to district court for assessment of credibility and trustworthiness because there was triable issue of fact regarding formation of arbitration agreement); *Howard*, 748 F.3d at 980 (vacating denial of motion to compel arbitration and remanding case to district court for bench trial to determine credibility and make assessments regarding material disputes of fact). Examining the written contract in conjunction with the testimonial record, the Court concludes that Dyevich and Wilkinson mutually agreed that WCW was a party to the Agreement.

The record evidence also demonstrates that the parties shared a mutual understanding of the purpose of the Agreement. Dyevich testified that the agreement was "based upon an understanding that was presented to all parties that Atlantis Industries, Inc., was to receive a share of the royalties from the KCI relationship, the KCI/MPL licensing agreement." (Doc. 99 at 15:5–8.) John W. Wilkinson similarly testified that he and Dyevich "had an understanding that Kevin [Dyevich] would get royalties" from the KCI/MPL agreement, because Dyevich was "instrumental" in forming the relationship between those parties. (Doc. 97 at 43:16, 43:25.) Dyevich was "not involved in th[e] discussions" regarding forming the relationship, and the "development with KCI's licensing came directly through [Wilkinson] and through WCW." (*Id.* at 44:3–5.) Wilkinson did not remember the particular details of the agreement, but he "recall[ed] that [Dyevich] was going to share in some of the royalty stream." (*Id.* at 48:8–9.) The consistent testimony in this regard reflects Wilkinson's and Dyevich's common understanding that Dyevich would share in royalties derived from the proceeds of the KCI/MPL venture. *Pagnani-Braga-Kimmel Urologic Assoc., P.A.*, 968 A.2d at 1245 (examining mutual

assent within context of surrounding facts and circumstances); *Payer*, 2015 WL 4715953, at *3 (explaining necessity of objective intent in finding mutual assent).

Finally, the evidence related to the parties' execution of the Agreement further demonstrates their intent to bind WCW, Atlantis Industries/Dyevich, and MPL/Wilkinson to its terms. Beginning with the format of the signature page, it contains three typed signature blocks, labeled "WCW, INC.," "MPL, INC.," and "Atlantis Industries, Inc." (Doc. 1-1 at 10.) Under the name of each company is a signature line. (*Id.*) Below the signature line are three lines designated for the signatory's name, title, and the date of signature. (*Id.*) Kevin Dyevich's signature appears on the signature line for Atlantis Industries. (*Id.*) Below his signature is his printed name, his title ("Pres"), and the date (February 26, 2001). (*Id.*) Under MPL, Inc., the signature line is blank. (*Id.*) Howard Lawrence's signature appears on the line designated for his title, and his printed name appears on the line designated for his name. (*Id.*) Lawrence's signature is dated April 2, 2001. (*Id.*) Finally, John Wilkinson signed on the signature line for WCW. Next to his signature appears to be the title "Chairman" written in script. (*Id.*) John Wilkinson's name is handwritten in print on the "Name" line, and his signature appears again on the "Title" line. (*Id.*) This signature block is dated April 25, 2001. (*Id.*)

Dyevich explained which entities were party to the Agreement:

[T]here's four entities involved in the signature and memorializing this document: one being Atlantis Industries, the Bahamian company, which I signed as president; the others being John Wilkinson signing as chairman of WCW, Inc., out of Vermont; the other party would be Howard Lawrence, which is one of the directors of MPL Bahamian company; and finally, John Wilkinson signed individually.

(Doc. 99 at 14:1–7.)

Dyevich also explained the chronological sequence of the various signatures. He testified that he "physically signed [the Agreement] in the state of New Jersey as president on February

26, 2001," and then he "called John and [he] asked him whose signature will be in a place for MPL." (*Id.* at 15:16–18.) Wilkinson directed Dyevich to send the Agreement to the Bahamas, where Howard Lawrence signed the Agreement and sent it back to Dyevich in April 2001. (*Id.* at 15:18–22.) Wilkinson testified that "Howard Lawrence was one of the directors of MPL." (Doc. 97 at 49:5.) Though Wilkinson stated that as a shareholder of MPL, he "think[s] [he] could have" signed on its behalf, he also stated that the directors would "normally do that." (*Id.* at 53:24–25.) That Lawrence signed on behalf of MPL—and Wilkinson suggested that it was customary for MPL directors to sign contracts instead of Wilkinson—is a further indication that Wilkinson's participation in the execution of the Agreement was intended to be on WCW's behalf, as demonstrated by his signature as WCW Chairman.

Dyevich and Wilkinson arranged to meet in Hoosick Falls, New York to execute the Agreement, where Wilkinson signed the contract. (Doc. 99 at 15:24–16:7.) Wilkinson confirmed that he was Chairman of the Board of WCW when he signed the Royalty Agreement, and that Dyevich was "very aware" of that fact. (Doc. 97 at 55:10–19.) Wilkinson emphasized at the evidentiary hearing that he intended to sign the Royalty Agreement for MPL. (*Id.* at 54:5–7.) However, when asked why Howard Lawrence's signature appeared for MPL if Wilkinson had intended to sign for MPL, he stated that "Kevin may have wanted a signature, and for MPL it was going to take more time for Howard Lawrence" to sign the Agreement. (*Id.* at 54:9–12.) This response was not consistent with the documented sequence of events, as the Agreement reflects that Howard Lawrence signed the Agreement before Wilkinson did. (*See* Doc. 1-1 at 10.)

Dyevich explained that "[t]he attorney that drafted this contract failed to print John Wilkinson's name on the signature page, so when [Dyevich] drove up to New York state,

Hoosick Falls, in 2001 to meet with John for his signature, [Dyevich] pointed it out to him."

(Doc. 99 at 14:17–21.)  Wilkinson accordingly "took the liberty of writing in his name, and then

he signed his name, his signature, under his name, which codified himself individually agreeing

to . . . this particular contract."  (*Id.* at 14:21–24.)  Dyevich's accounting for the sequence of

signatures corresponds with the executed Agreement and is reasonable given the parties' prior

course of dealing and relationship history.  *See Pagnani-Braga-Kimmel Urologic Assoc., P.A.*,

968 A.2d at 124.

In the January 2021 Order, Chief Judge Crawford articulated one possibility for what

occurred during the execution of the Royalty Agreement:

> Wilkinson handwrote proposed changes to the typewritten Royalty Agreement, but
> was unable to persuade Dyevich to agree to any of Wilkinson's proposed changes
> except the deletion of the definition of "affiliate."  Unable to convince Dyevich to
> agree to the other proposed changes, Wilkinson signed the Royalty Agreement,
> which went into effect as originally typewritten except with the deletion of the
> definition of "affiliate."

(Doc. 51 at 28.)  This scenario is consistent with the actual contract as executed, the evidence

received, and the testimony presented at the evidentiary hearing.  Dyevich's testimony was

credible, providing a specific and reasonable accounting of what occurred in the execution of the

Royalty Agreement.  John W. Wilkinson, by contrast, shed comparatively little light on contract

formation issues.  For example, pertinent to Jeffrey Wilkinson's suggestion that WCW's

payments to Dyevich were likely loan repayments to MPL (that his father directed to Dyevich to

satisfy an unspecified financial obligation), John W. Wilkinson could point to no promissory

notes or other loan documents between MPL and WCW.  (Doc. 97 at 41:19–25.)  John W.

Wilkinson acknowledged that he and Dyevich understood that Dyevich would receive royalties,

but he was unable to recall the terms of that understanding.  (*Id.* at 43:14–19.)  He also

acknowledged that royalties were in fact paid to Dyevich, but the source of the royalty payments

was not clear.  When asked about the terms of his royalty arrangement with Dyevich, Wilkinson stated: "It's 25 years ago.  But . . . we did pay royalties.  MPL did.  Or through WCW."  (*Id.* at 43:19–20.)  In other words, Wilkinson testified that royalties were paid to Dyevich *through* but not *by* WCW.  If credited, such a distinction arguably suggests that WCW's pass-through function for payments is insufficient to establish that it was a part of the agreement.  However, the record as a whole does not support this distinction for the following reasons: (a) there was no meeting of the minds to substitute MPL for WCW in the Agreement, making WCW a party to the contract; (b) Wilkinson's signature appears in the column under "WCW, Inc."; and (c) WCW issued over $470,000 in checks to Atlantis between 2000 and 2004, three of which contained the word "ROYAL" on the associated separation forms, strongly suggesting that the purpose of the checks was the payment of royalties.[12]

There are additional reasons to reasonably conclude that WCW was an intended party to the Agreement.  Notwithstanding the fact that the written Agreement—with all its strikethroughs, attempted alterations, and various signatures, including Wilkinson's—is at the center of this dispute, Wilkinson testified that his understanding with Dyevich as to royalties was verbal.  (*Id.* at 44:6–12.)  Given the two decades since the contract's formation, Wilkinson was unable to recall many basic details, such as whether he and Dyevich were together at the time of the contract's execution (*id.* at 46:21–47:1); whether he signed the contract or where he signed the contract (*id.* at 48:4–7); whether anyone witnessed the execution of the contract (*id.* at 48:9–10); and whether anyone signed on behalf of MPL (*id.* at 48:25–49:3).  At the same time, however, he was certain that he was not authorized to sign on WCW's behalf and that Dyevich "understood that the [R]oyalty [A]greement wasn't with WCW, it was with MPL."  (*Id.* at 46:1–4, 54:1–4.)

---

[12] Jeffrey Wilkinson disagreed that the term "ROYAL" in these circumstances necessarily signified royalty payments, implausibly testifying that "ROYAL" could refer to royal fabric.  (Doc. 97 at 34:1–8.)

Given the ample record evidence suggesting otherwise, the Court does not find this testimony persuasive.

Therefore, the evidence demonstrates that a binding contract resulted among WCW, MPL, and Dyevich/Atlantis Industries for the payment of royalties to Atlantis Industries and incorporating the arbitration provision.

### C.    Wilkinson's Authority to Bind WCW

Plaintiffs and Third-Party Defendants argue that even if there was an enforceable agreement formed by Dyevich and Wilkinson, Wilkinson lacked the authority to bind WCW to a contract. (Doc. 100 at 5–6.)

### 1.    Law of Actual and Apparent Authority

"Under New Jersey law, an agent may bind a principal to contracts with third[ ]parties for acts that are within the agent's actual or apparent authority." *Recom Corp. v. Miller Brothers, a Div. of Wampole-Miller, Inc.*, Civil Action No. 16-3320 (SRC), 2018 WL 3930090, at *5 (D.N.J. Aug. 16, 2018). "Actual authority is the authority that a principal expressly or implicitly gives an agent." *Automated Salvage Transp., Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 617 (D.N.J. 1999). "Most actual authority, however, is created by implication. . . . For the most part, an agent has implied authority to undertake all transactions necessary to fulfill the duties required of an agent in exercise of express authority." *Id.*

"Apparent authority arises 'when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Recom Corp.*, 2018 WL 3930090, at *5 (quoting Restatement (Third) of Agency § 2.03 (2006)). "Where the principal's actions cause the third party to reasonably believe in the agent's apparent authority, the principal will be bound even where the agent is not an actual agent." *Id.* (internal

quotation marks omitted).  Apparent authority is "created by the conduct of the alleged principal[,] and it cannot be established alone and solely by proof of conduct by the supposed agent."  *Id.*  "Such authority 'may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case.'"  *Id.* (quoting *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 79 (N.J. 1993)).  The third party seeking to bind the principal must demonstrate "that it relied on the agent's apparent authority to act for a principal" and that "the reliance was reasonable under the circumstances."  *Id.*  "Corporations, like natural persons, are bound only by the acts and contracts of their agents done and made within the scope of their authority."  *C.B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co. of Newark*, 101 A.2d 544, 548 (N.J. 1953).  Relevant here, courts have held that the chairman of the board of directors has inherent apparent authority to bind a company.  *Lisa Cooley, LLC v. Native, S.A.*, No. 20-CV-5800 (VEC), 2021 WL 860591, at *4 n.4 (S.D.N.Y. Mar. 5, 2021) (an individual's "undisputed title of 'Chairman' imbued him with apparent authority to sign the [contract] and bind Defendant."); *Fed. Deposit Ins. Corp. v. Texas Bank of Garland*, 783 S.W.2d 604, 607 (Tex. Ct. App. 1989) (finding that appointing a person to the position of chairman of the board or chief executive officer "may, in itself, create apparent authority in an employee").

### 2.    Analysis of Actual Authority

Defendants assert that Wilkinson had actual authority to bind WCW:

> Even though [Wilkinson] was neither an officer nor shareholder of WCW, Mr. Wilkinson exercised tremendous power over the company.  He was not just father and husband to the company's officers and directors, but he was the company's major creditor and held the patents on most of the products that the company manufactured under a revocable license.

(Doc. 101 at 5.)  WCW and Third-Party Defendants assert that Wilkinson did not have the authority to sign for WCW because he was not an owner, officer, or shareholder of WCW.  (Doc. 100 at 5.)

It is undisputed that Wilkinson was Chairman of the Board of WCW when he signed the Agreement.  (Doc. 97 at 55:10–12.)  Wilkinson was certain that Dyevich knew he was Chairman when he signed the contract.  (*Id.* at 55:13–19.)  Further, Dyevich emphasized that he "only had one contact in the [fourteen] years that [he] dealt with WCW, and that was John W. Wilkinson." (Doc. 99 at 23:5–6.)  Though he had one initial contact with Jeffrey Wilkinson in 1994, he "didn't have any contact with Jeff for the next [fourteen] years other than to exchange a pleasantry when [he] would physically see him." (*Id.* at 23:9–12.)  According to Jeffrey Wilkinson, he thought he "originally got a phone call from [Dyevich] looking for someone to make some product, and [he] think[s] that turned into an introduction to [his] father and then from there on out." (Doc. 97 at 16:12–14.)  Dyevich likewise testified that Atlantis Industries was "trying to outsource manufacturing of certain medical products" and "identified a company out of Bennington, Vermont, called WCW that was actually manufacturing private-label products for various companies in the medical marketplace." (Doc. 99 at 9:16–21.)  At that point, Dyevich called WCW and "[a] gentleman by the name of Jeff Wilkinson answered the phone, and he passed along the information to his father," who then contacted Dyevich.  (*Id.* at 9:22–24.)

After that meeting, Dyevich was in contact with John W. Wilkinson "five to six days per week for [fourteen] years." (*Id.* at 23:19.)  Dyevich testified that he and Wilkinson had a business relationship that "unfolded beautifully" and led to "many millions of dollars in sales." (*Id.* at 10:17–21.)  Jeffrey Wilkinson testified that he knew Dyevich because WCW and Dyevich

"did business together for many years." (Doc. 97 at 16:8.) John W. Wilkinson testified that he "became aware of [Dyevich] through [his] son Jeffrey, who was manufacturing products for a company that [Dyevich] was operating." (*Id.* at 42:9–11.) Wilkinson could not recall whether he and Dyevich had a conversation regarding his role at WCW, but "the relationship between [Dyevich] and [Wilkinson] was close enough so that he clearly understood [Wilkinson's] role with WCW was to do product development and to also help in initiating contacts to further manufacture products that [he] was patenting." (*Id.* at 42:22–43:2.) Wilkinson and Dyevich had "a lot of understandings" that were verbal in nature, including that Dyevich would receive royalties from the KCI agreement. (*Id.* at 43:8–17.)

WCW had an established financial relationship with John W. Wilkinson. According to Jeffrey Wilkinson, more than fifty percent of WCW's income in 2001 derived from the sale of products incorporating patents owned by MPL. (*Id.* at 23:6–11.) Jeffrey Wilkinson also testified that John W. Wilkinson loaned WCW money on several occasions, though he could not recall how many times or the amount of the loans. (*Id.* at 29:1–9.) Minutes from shareholder meetings and Jeffrey Wilkinson's testimony establish that Wilkinson continued to loan WCW money through at least 2003. (*Id.* at 14:7–10.) Thus, WCW depended on Wilkinson and/or MPL for use of its patents in product manufacturing and for occasional infusion of capital.

Although Jeffrey Wilkinson and John W. Wilkinson both testified that John W. Wilkinson did not have the authority to sign contracts for WCW (*see id.* at 10:21–23, 54:3–4), the record suggests otherwise. Wilkinson continuously and independently contracted with Dyevich throughout the course of their business relationship. Wilkinson's testimony that part of his role was to "help in initiating contacts to further manufacture products that [he] was patenting" is indicative of that fact. (*Id.* at 42:22–43:2.) Additionally, the 2001 minutes of the

WCW shareholders meeting record that "John C. will work closely with John W. in product development" and "John W. will continue to develop market opportunities for manufacturing." (Doc. 94-4 at 55.)  Developing market opportunities for manufacturing appears to be exactly what Wilkinson was doing throughout his relationship with Dyevich.  Although John W. Wilkinson was not a shareholder of WCW, he acted as Chairman at every Annual Meeting of Shareholders and Annual Meeting of the Board of Directors from late 1997 until at least 2004. (*Id.* at 30–76.)  Additionally, although Jeffrey Wilkinson retired his shares of WCW in 2000, presumably as President he retained authority to bind WCW contractually.  (*Id.* at 48.)  It is reasonable to conclude that Wilkinson retained similar authority as Chairman.

Under these circumstances, Wilkinson had "implied authority to undertake all transactions necessary to fulfill the duties required" of him while exercising the express authority granted by WCW.  *See Automated Salvage Transp., Inc.*, 106 F. Supp. 2d at 617.  Wilkinson's execution of a royalty agreement with Dyevich would be well within his authority as WCW's agent, given their prior business history and close working relationship over the years prior to the Royalty Agreement.  *See C.B. Snyder Realty Co.*, 101 A.2d at 548.

### 3.    Analysis of Apparent Authority

Even assuming Wilkinson—as Chairman of WCW's Board, father of WCW's President, creditor of WCW, and patent licensor to WCW—did not have actual authority to contract on WCW's behalf, given the longstanding course of dealing between Dyevich and Wilkinson, Dyevich reasonably relied on Wilkinson's apparent authority to act on WCW's behalf.  *Recom Corp.*, 2018 WL 3930090, at *5.  Wilkinson and Dyevich enjoyed a lucrative years-long relationship.  Over the course of that relationship, Dyevich's exclusive point of contact was Wilkinson.  Consequently, Dyevich reasonably would have expected to enter into the Agreement

with Wilkinson. Jeffrey Wilkinson connected Dyevich and Wilkinson in 1994, after which Wilkinson and Dyevich almost exclusively dealt with each other on business matters. These facts amply support the conclusion that Wilkinson had apparent authority to form the Agreement. *Id.*

When the Agreement was executed in 2001, Atlantis Industries and WCW had been doing business together for seven years. (Doc. 99 at 9:13–21.) Their relationship stemmed from Dyevich and Wilkinson's initial contact, leading to continuous contacts that spanned over a decade, and culminating in a business relationship that was extremely lucrative for the parties. (*Id.* at 10:17–21, 23:19.) Jeffrey Wilkinson's testimony that he knew Dyevich because they had a long business relationship, coupled with Dyevich's testimony that he did not speak with Jeffrey Wilkinson except to exchange the occasional pleasantry, further supports the conclusion that WCW's business relationship with Atlantis Industries was conducted through John W. Wilkinson. Finally, Dyevich and Jeffrey Wilkinson both testified that Dyevich called WCW seeking to outsource his medical mattress manufacturing to WCW. As John W. Wilkinson, Jeffrey Wilkinson, and Dyevich have each testified, MPL only licensed patents and was not involved with manufacturing. If Wilkinson was not a decisionmaker for WCW, it would make little sense for Jeffrey Wilkinson (whose company *does* manufacture mattresses) to connect Dyevich with Wilkinson (whose company *does not* do any manufacturing) in response to an inquiry about product manufacturing. On these facts, Dyevich reasonably believed that Wilkinson had apparent authority to bind WCW, resulting in a binding contract between WCW and Dyevich/Atlantis Industries.

**D.      WCW's payment to Dyevich of almost $500,000 between 2000 and 2004 constituted ratification of the Royalty Agreement by WCW.**

Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Cunningham v. Cap. Advance Sols., LLC*, Civil Action No. 17-13050 (FLW), 2018 WL 6061405, at *6 (D.N.J. Nov. 20, 2018) (quoting Restatement (Third) of Agency, § 4.01 (2006)). Ratification requires both the "intent to ratify plus full knowledge of all the material facts." *Martin Glennon, Inc. v. First Fid. Bank, N.A.*, 652 A.2d 199, 205 (N.J. Super. App. Div. 1995). "Ratification may be express or implied, and intent may be inferred from the failure to repudiate an unauthorized act; from inaction; or from conduct on the part of the principal which is inconsistent with any other position than intent to adopt the act." *Id.* However, while an "intent to ratify an unauthorized transaction may be inferred from a failure to repudiate it . . . , in most cases, the silence or inaction of a principal will not ratify the agent's unauthorized act unless it is clear that the principal was fully informed of what the agent did." *Reibman v. Myers*, 164 A.3d 1080, 1090 (N.J. Super. Ct. App. Div. 2017).

The 1999 minutes of WCW's shareholders meeting indicate that "as a result of the growth demands realized from the KCI contract, WCW will need substantial capital to increase capacity for manufacturing." (Doc. 94-4 at 42.) At that time, "John W. authorized WCW to manufacture the patented technologies held by MPL, Ltd. for sale to KCI as well as other consumer distributors," and "John W. also agreed to continue loan advances to WCW to meet capital requirements to fund the ongoing expansion." (*Id.* at 43.) The 2000 minutes also state that "[d]iscussion was held regarding borrowing more money from MPL to facilitate the expansion of WCW's manufacturing capabilities," and "John W. agreed." (*Id.* at 48.) The record evidence demonstrates that WCW continued to discuss borrowing money from MPL through at least 2004. (*See id.* at 73.)

Jeffrey Wilkinson confirmed that his father, John W. Wilkinson, agreed to loan WCW money to fund its ongoing expansion. (Doc. 97 at 11:17–22.) Jeffrey Wilkinson was unsure if he and his father had an agreement for WCW's repayment obligations, but "[t]he best that [he] can recall is when the business was able to, it would refund the money back." (*Id.* at 13:14–18.) When asked about the checks paid from WCW to Atlantis Industries, Jeffrey Wilkinson suggested that "[his] father would have asked WCW to pay some money to Atlantis in lieu of paying him back." (*Id.* at 15:3–4.) Jeffrey Wilkinson reiterated that if WCW did pay Atlantis Industries, "it would have been at [his] father's request," and it would have been "a repayment towards any funds that [they] had borrowed through him." (*Id.* at 15:19–21.) When asked about the notation of "ROYAL" on several of the checks WCW sent to Atlantis Industries, Jeffrey Wilkinson testified that the checks "would be [WCW] repaying loans or advances to [John W. Wilkinson], and what they were for from his side to Atlantis could very well be for royalties, but it wasn't WCW paying royalties to Atlantis." (*Id.* at 32:2–4.) Jeffrey Wilkinson further insisted that the "royal" notation could be because he "buy[s] a lot of fabric that's royal." (*Id.* at 34:4–5.)

As described above, Dyevich received at least seven checks from WCW totaling almost $500,000 between June 2000 and March 2004. (Doc. 93-2; Doc. 99 at 26:11–13.) The separation forms associated with three of these checks contained the notation "ROYAL." (Doc. 93-2 at 2, 3; Doc. 94-5 at 2.) Dyevich testified that the royalty payments ended because WCW became involved in a lawsuit that required it to suspend payments in order to conserve financial resources for litigation expenses. (Doc. 99 at 26:15–27:4, *id.* at 28:14–15.) At WCW's 2003 shareholder meeting, "Jeff reported WCW must be diligent and not let this litigation disrupt and detract from the focus of business." (Doc. 94-4 at 67.) The minutes of WCW's 2004

shareholders meeting indicate that the "litigation [was] heating up, costs are exorbitant." (*Id.* at 73.) These minutes appear to coincide with the suspension of checks to Dyevich.

Considering the evidence and testimony as a whole, it is reasonable to conclude that these checks were royalties from WCW to Atlantis Industries, which amounted to WCW ratifying the Agreement when it sent almost $500,000 in payments to Atlantis Industries. The fact that the payments appeared to end around the time WCW became embroiled in litigation in 2004 further suggests that WCW was paying royalties to Atlantis Industries between 2000 and 2004. If the royalty payments were not coming from WCW, it would seem that WCW's litigation and settlement costs should not have affected MPL or Wilkinson's ability to continue paying Dyevich. It is not plausible that WCW would send almost $500,000 in checks (several of which clearly contain the "ROYAL" notation) to Atlantis Industries on behalf of John W. Wilkinson, believing it was paying its loan obligations to Wilkinson through payment to Dyevich for an unknown financial obligation Wilkinson owed Dyevich. *See Reibman*, 164 A.3d at 1090.

Therefore, even assuming Wilkinson did not have the authority to contract on behalf of WCW in 2001, WCW ratified the Agreement through its payment of substantial royalties to Atlantis Industries over a period of years.

### E.    Effect of 2014 Assignment Agreement Between MPL and WCW

As noted above, the record contains a September 17, 2014 Assignment Agreement between John W. Wilkinson on behalf of MPL, Ltd. and Jeffrey Wilkinson on behalf of WCW, Inc. (Doc. 93-10.) The Assignment Agreement provides that "MPL hereby transfers and assigns to WCW all right, title and interest in and to all MPL Technology." (*Id.*) According to the assignment agreement, "MPL Technology is to be construed broadly and shall encompass all

conceivable forms of technology, proprietary rights, registrations, know-how and information."
(*Id.*)  Of particular relevance here, "MPL Technology" also included "contractual rights."  (*Id.*)

Defendants assert that in addition to Wilkinson's authority to contract for WCW and WCW's ratification of the agreement, the 2014 assignment of MPL's contract rights to WCW renders WCW a party to the Royalty Agreement.  (Doc. 101 at 7.)  WCW and Third-Party Defendants contend WCW is not "bound by the terms of the Royalty Agreement because there was never an agreement," and therefore the Assignment Agreement does not make it a party to the Royalty Agreement.  (Doc. 100 at 13.)

The validity of the assignment agreement is not disputed.  As a general matter, "[a]ssignment requires an assignable right, and an assignee of a claim takes it with whatever limitations it had in the hands of the assignor."  *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 510 (D.N.J. 2014) (internal quotation marks omitted) (finding that agreement to arbitrate would be assigned if found to be valid).  Additionally, "when an assignee assumes the liabilities of an assignor, it is bound by an arbitration clause in the underlying contract."  *HT of Highlands Ranch, Inc. v. Hollywood Tanning Sys., Inc.*, 590 F. Supp. 2d 677, 684 (D.N.J. 2008) (quoting *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005)).  "[A]n assignment cannot alter a contract's bargained-for remedial measures, for then the assignment would change the very nature of the rights assigned."  *Trippe Mfg. Co.*, 401 F.3d at 533 (internal quotation marks omitted).

Given the finding that WCW, MPL, and Dyevich entered into a binding Royalty Agreement, the assignment agreement provides a further basis to conclude that WCW was a party to the Royalty Agreement, as assignee of MPL's contractual obligations under the Royalty

Agreement. Even in the absence of the Assignment Agreement, however, the record evidence amply supports the conclusion that WCW was a party to the Royalty Agreement.

### F. Severability of the Arbitration Provision

WCW asserts that although the Royalty Agreement is not valid or enforceable, the arbitration clause is severable from the underlying agreement. According to WCW, "[i]t is well established that a party may dispute the overall validity of an agreement, yet still compel arbitration pursuant to a specific clause contained in the agreement." (Doc. 100 at 10 (citing *Rent-A-Ctr., W.*, 561 U.S. at 70).) "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). "[U]nder the severability principle, [the court] treat[s] a challenge to the validity of an arbitration agreement . . . separately from a challenge to the validity of the entire contract in which it appears." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019). Because the Court recommends a finding that the Royalty Agreement is a valid and enforceable contract—and therefore contains an enforceable arbitration provision—it does not consider WCW's argument that the arbitration provision is severable from the remainder of the Royalty Agreement.

## II. Waiver of Arbitration

Defendants assert that although the Royalty Agreement—and its incorporated arbitration provision—is valid and enforceable, Plaintiffs and Third-Party Defendants have waived their right to arbitrate. (Doc. 101 at 8–9.) WCW and Third-Party Defendants respond that they have not waived arbitration because "[t]he filing of the lawsuit in and of itself does not act as a waiver of arbitration," and "[t]here has been no substantial litigation going to the merits of the case." (Doc. 100 at 11.)

As an initial matter, although waiver of arbitration is typically a matter within the purview of the arbitrator, courts may determine whether a party has waived arbitration through its litigation conduct. *Meyer*, 868 F.3d at 80–81 (noting that ordinarily "a defense of waiver brought in opposition to a motion to compel arbitration . . . is a matter to be decided by the arbitrator," but when "the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver" (internal quotation marks omitted)).

### A.    Effect of *Morgan* on Waiver of Arbitration Analysis

Waiver generally involves "the intentional relinquishment or abandonment of a known right." *Morgan*, 142 S. Ct. at 1713 (internal quotation marks omitted). "To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party." *Id.* "Waiver may be established by affirmative conduct or by failure to act that evinces the intent to abandon the right." *Coggins v. County of Nassau*, 615 F. Supp. 2d 11, 30 (E.D.N.Y. 2009). This general contractual waiver "involves the act or conduct of one party to the contract only, and involves both knowledge and intent on the part of the waiving party." *Gonyea v. John Hancock Mut. Life Ins. Co.*, 812 F. Supp. 445, 450 (D. Vt. 1993) (quoting *Lynda Lee Fashions, Inc. v. Sharp Offset Printing, Inc.*, 352 A.2d 676, 677 (Vt. 1976)).

In the customary analysis of waiver in the arbitration context, courts have held that "[a] party can waive its arbitration right by litigating only when its conduct has prejudiced the other side." *Morgan*, 142 S. Ct. at 1711. Consequently, prior to *Morgan* courts in this Circuit considered "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and

(3) proof of prejudice." *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (internal quotation marks omitted). Under this standard, "'mere delay' in seeking a stay of litigation, 'without some resultant prejudice' to the opposing party, 'cannot carry the day.'" *Morgan*, 142 S. Ct. at 1713 (quoting *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968)).

In *Morgan v. Sundance, Inc.*, however, the Supreme Court recently rejected "an arbitration-specific waiver rule demanding a showing of prejudice." 142 S. Ct. at 1712. In addition to its central holding that prejudice is not an element of waiver in the arbitration context, the Supreme Court clarified two concepts frequently cited when courts consider whether a party has waived arbitration: (1) that the FAA embodies a "policy favoring arbitration"; and (2) that the waiver of the right to arbitrate "is not to be lightly inferred." *Id.* at 1711, 1713.

The Court framed the legal and factual issues in *Morgan* as follows:

> When a party who has agreed to arbitrate a dispute instead brings a lawsuit, the [FAA] entitles the defendant to file an application to stay the litigation. But defendants do not always seek that relief right away. Sometimes, they engage in months, or even years, of litigation—filing motions to dismiss, answering complaints, and discussing settlement—before deciding they would fare better in arbitration. When that happens, the court faces a question: Has the defendant's request to switch to arbitration come too late?

*Id.* at 1710–11 (internal statutory citation omitted). The Supreme Court acknowledged that the Courts of Appeals almost uniformly adopted the prejudice requirement based on the "liberal national policy favoring arbitration." *Id.* (internal quotation marks omitted).

*Morgan* clarified, however, that waiver analysis should not proceed from the notion that arbitration is to be favored over litigation. "[T]he FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Id.* (citation omitted). Ultimately, "[t]he policy is to make 'arbitration agreements as enforceable as other

contracts, but not more so.'" *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,

388 U.S. 395, 404 n.12 (1967)).  In other words, the court must analyze waiver under customary

legal doctrines:

> [A] court may not devise novel rules to favor arbitration over litigation.  If an
> ordinary procedural rule—whether of waiver or forfeiture or what-have-you—
> would counsel against enforcement of an arbitration contract, then so be it.  The
> federal policy is about treating arbitration contracts like all others, not about
> fostering arbitration.

*Id.* (internal citation omitted).

### B.    Waiver of Arbitration Analysis After *Morgan*

The Second Circuit has not determined "whether *Morgan* instructs courts to adopt

general waiver analysis, or instead instructs courts to strip any prejudice requirement from their

existing analysis of waivers of the right to arbitration under the FAA."  *Herrera v. Manna 2nd*

*Ave. LLC*, No. 1:20-cv-11026-GHW, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022).  The

unclear state of the law on this issue affects the waiver analysis because "while the general test

for waiver of a contractual right considers intent to waive, the test for waiver of the right to

arbitrate considers only the length of time elapsed and the amount of litigation to date."  *Id.*

Specifically, courts assessing waiver of the right to arbitrate consider: "(1) how much time

passed from commencement of litigation to that party's request to arbitrate? and (2) what

litigation—quality and quantity—such as discovery and motion practice has taken place?"

*Alvarez v. Experian Info. Sols., Inc.*, --- F. Supp. 3d ---, 2023 WL 2519249, at *8 (E.D.N.Y. Mar.

15, 2023) (referred to as the "two-factor" test).

At least one district court in this Circuit has interpreted *Morgan* to require examination of

"the affirmative conduct of the party seeking to compel as to whether that conduct rose to the

level of a known waiver[,] . . . expressly tak[ing] into consideration the party's intent to waive."

*Id*. As one district court recently observed, although the waiver tests in other circuits would lead to outcomes that are generally the same regardless the standard applied, "in the Second Circuit— which has not yet interpreted *Morgan*—there is a more significant (and, in some cases, possibly dispositive) difference between the two tests." *Herrera*, 2022 WL 2819072, at *8.[13]

After *Morgan*, district courts in the Second Circuit assessing waiver-of-arbitration have taken varying approaches. Some courts apply general contractual waiver principles; others apply the two-factor test without the prejudice requirement; and others apply a combination of the standards. *See Alvarez*, 2023 WL 2519249, at *9 (applying "the two-factor test along with general contractual waiver principles in mind"); *Levy v. Credit Plus, Inc.*, No. 7:21-CV-5541 (KMK), 2023 WL 2644352, at *10 (S.D.N.Y. Mar. 27, 2023) (applying two-part test in light of *Morgan*); *Cimillo v. Experian Info. Sols., Inc.*, No. 21 CV 9132 (VB), 2023 WL 2473403, at *9 (S.D.N.Y. Mar. 13, 2023) (same); *Flores v. Nat'l Football League*, --- F. Supp. 3d ---, 2023 WL 2301575, at *8 (S.D.N.Y. Mar. 1, 2023) (noting that the Second Circuit has held that "delay alone . . . is insufficient to constitute waiver when the parties had not engaged in substantive litigation before the defendant belatedly sought arbitration"); *Boustead Sec., LLC v. Leaping Grp. Co.*, --- F. Supp. 3d ---, 2023 WL 2481109, at *3 n.7 (S.D.N.Y. Feb. 14, 2023) ("The Court therefore applies the Second Circuit's preexisting waiver analysis, specific to arbitration, but without taking into account prejudice."); *Deng v. Frequency Elecs., Inc.*, --- F. Supp. 3d ---, 2022 WL 16923999, at *6 (E.D.N.Y. Nov. 14, 2022) (concluding that "applying waiver to an

---

[13] Although the Second Circuit does not yet appear to have provided definitive guidance on the appropriate test for waiver of arbitration post-*Morgan*, in a recent post-*Morgan* unpublished decision reviewing a district court's application of the Second Circuit's pre-*Morgan* standard, the court stated that in light of *Morgan* it must determine "whether [the defendant's] conduct evinced a knowing relinquishment of its arbitration rights." *Billie v. Coverall N.A. Inc.*, No. 22-718-cv, 2023 WL 2531396, at *3 n.3 (2d Cir. Mar. 15, 2023). After *Morgan*, the Second Circuit has also considered whether the party alleged to have waived arbitration "engaged in litigating any substantial merits questions before seeking arbitration." *Nicosia v. Amazon.com, Inc.*, No. 21-2624-cv, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023) (internal quotation marks omitted).

arbitration agreement should be the same as applying waiver in the context of any other kind of contract"); *Carollo v. United Cap. Corp.*, No. 6:16-cv-00013, 2022 WL 9987380, at \*3 (N.D.N.Y. Oct. 17, 2022) (applying Second Circuit's arbitration waiver test without prejudice requirement); *De Jesus v. Gregorys Coffee Mgmt., LLC*, No. 20-CV-6305 (MKB) (TAM), 2022 WL 3097883, at \*7 (E.D.N.Y. Aug. 4, 2022) (considering "whether Defendants knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right by considering the time elapsed and the amount of litigation to date" (internal quotation marks omitted)); *Herrera*, 2022 WL 2819072, at \*8 (noting general contractual waiver test "seems most consistent with *Morgan*'s reasoning" but finding same result under either test).

### C. Consideration of Waiver of Arbitration Under the Two-Factor Test in Conjunction with General Contractual Waiver Principles

The Court applies the two-factor test "with general contractual waiver principles in mind." *See Alvarez*, 2023 WL 2519249, at \*9. This approach is appropriate on the particular facts of this case, as it permits the Court to consider both the lengthy prelitigation conduct of the parties as well as the history of the case after litigation commenced, recognizing that waiver of arbitration is a "fact-specific" inquiry with "no bright-line rules." *S&R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998). "The Second Circuit has held that in some circumstances a party's pre-litigation conduct that is inconsistent with the right to arbitrate can amount to a waiver of that right." *Schreiber v. Friedman*, No. 15–CV–6861 (CBA) (JO), 2017 WL 5564114, at \*9 (E.D.N.Y. Mar. 31, 2017); *Lane, Ltd. v. Larus & Bro. Co.*, 243 F.2d 364, 367 (2d Cir. 1957) ("A party cannot raise unjustifiable objections to a valid demand for arbitration, all the while protesting its willingness in principle to arbitrate and then, when the other side has been forced to abandon its demand, seek to defeat a judicial determination by asking for arbitration after suit has been commenced."). "Accordingly, where a [party] has

previously refused to submit to arbitration when the plaintiff was 'ready, able and willing to arbitrate its claim and arbitrators were standing by to hear it,' the [opposing party] 'ought not in fairness be able to shift its position and force arbitration on [the other party].'" *Schreiber*, 2017 WL 5564114, at *9 (quoting *Farr Whitlock Dixon & Co. v. S.S. Gen. Tsakalatos*, 244 F. Supp. 544, 546 (S.D.N.Y. 1965)).

Applying these standards, the Court reviews the record for evidence that WCW and Third-Party Defendants "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Billie*, 2023 WL 2531396, at *3 n.3. This examination considers "the affirmative conduct of the party seeking to compel as to whether that conduct rose to the level of a known waiver," an inquiry that involves an assessment of the party's "intent to waive." *Alvarez*, 2023 WL 2519249, at *8. It also involves an assessment of whether WCW and Third-Party Defendants "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right by considering the time elapsed and the amount of litigation to date." *De Jesus*, 2022 WL 3097883, at *7.

As recounted in detail above, the parties' history long predates the litigation in this Court. The business dealings between Wilkinson and Dyevich began almost thirty years ago when Dyevich sold mattresses with Wilkinson's patented SAT features to the New York medical market. Their joint success resulted in a new venture with KCI and increased sales of mattresses. The disputed Royalty Agreement was executed over twenty years ago in 2001, and the present dispute centers around the cessation of payments to Dyevich almost twenty years ago in 2004. (Doc. 18 at 11, ¶¶ 54, 56.)

Between 2009 and 2018, Dyevich attempted to take WCW, MPL, and Wilkinson to arbitration three times. Dyevich first filed an arbitration action against WCW, Wilkinson, and

MPL in 2009.  (*Id.* at 9, ¶ 39; Doc. 56 at 5, ¶ 39.)  WCW and Third-Party Defendants assert that

Dyevich ended arbitration proceedings after he and several of his affiliates entered into a General

Release with WCW, MPL, and Wilkinson.  (Doc. 1 at 3, ¶ 17; Doc. 36 at 13, 14, ¶¶ 80, 82; Doc.

40 at 3, ¶¶ 12, 14.)  Dyevich asserts that Wilkinson convinced Dyevich to dismiss the arbitration

by promising the payments would resume in 2013, after Wilkinson satisfied his financial

obligations related to other litigation.  (Doc. 18 at 10, ¶ 40.)  The payments did not resume.  (*Id.*)

Dyevich brought another arbitration in 2013.  (Doc. 36 at 14, ¶ 83; Doc. 40 at 3, ¶ 15.)

WCW and Third-Party Defendants took the position that they had settled their disputes and

refused to contribute to the costs of arbitration.  (Doc. 36 at 14, ¶ 83; Doc. 64-4 at 3, ¶ 6.)

Dyevich ultimately abandoned this arbitration.  (Doc. 64-4 at 3, ¶ 6.)  When Dyevich sought to

arbitrate a third time in late 2018, WCW requested that the arbitrator dismiss the proceedings.

(Doc. 1 at 2, ¶ 8; Doc. 36 at 14, ¶ 84; Doc. 40 at 3, ¶ 16.)  During the pendency of its motion to

dismiss arbitration proceedings, WCW filed its Complaint in this Court.  WCW's litigation

objective was clear—to establish as a matter of law that arbitration was unavailable in its

ongoing dispute with Dyevich.  It requested a declaration "from this Court that WCW, Inc. is not

a party to the Royalty Agreement," and "because it is not a party to the Royalty Agreement, any

arbitration provision therein is unenforceable against WCW, Inc."  (Doc. 1 at 4, ¶¶ 23–24.)  The

Complaint also requested injunctive relief to ensure that it would not have to submit to

arbitration with Dyevich.  (*See id*. ¶ 28 ("Plaintiff continues to be exposed to harm by being

made a party to the improper arbitration demand"); *id*. ¶ 30 ("Since WCW, Inc. did not agree to

arbitrate and was not a party to the Royalty Agreement, it cannot be required to submit to

arbitration.").)  After Dyevich attempted three rounds of arbitration with WCW over a ten-year

period, the 2019 federal Complaint represented WCW's effort to ensure definitively that it would not be summoned to arbitration proceedings again.

The Court does not have an evidentiary basis to conclude that WCW and Third-Party Defendants' resistance to the several attempts at arbitration over the years amounts to "an intentional pattern of gamesmanship and delay" to ensure that the parties do not reach a resolution on the merits of the dispute. *See Schreiber*, 2017 WL 5564114, at *11 (concluding that a party's "failure to submit to arbitration, delay tactics, and noncompliance . . . amount to a waiver of his right to compel arbitration"). But even without assigning any responsibility for the fact that arbitration has been an unproductive process in this case, the fact remains that WCW and Third-Party Defendants had several opportunities to avail themselves of an arbitration forum. Indeed, Dyevich has repeatedly attempted to address his claims through arbitration. In the most recent round before the arbitrator in 2018, WCW advanced several reasons for dismissal of arbitration proceedings, including that it was not a party to the Royalty Agreement.

After resisting arbitration for almost ten years, and then initiating litigation in this Court with unequivocal claims that it has no obligation whatsoever to submit to arbitration with Dyevich, WCW has changed course and now elects to proceed to arbitration. This request was made over a year after the filing of the Complaint and significant developments had occurred in the case. About seven months after the Complaint was filed, in July 2020 Defendants filed counterclaims against WCW and Third-Party claims against MPL and John Wilkinson. (Doc. 18.) Third-Party Defendants filed an Answer to the Third-Party Complaint in September 2020 (Doc. 36.) A stipulated discovery schedule was entered in October 2020 (Doc. 44) and the parties made initial disclosures (*see* Docs. 45–47), propounded Interrogatories and Requests to

Produce (*see* Docs. 53–55), and submitted Answers to Interrogatories and Requests to Produce (*see* Docs. 59, 76, 77).

WCW filed a Motion to Dismiss Defendants' counterclaims in August 2020, which established its intention to adjudicate the merits of the competing claims in a judicial forum. (Doc. 27.) The Court denied the Motion to Dismiss. After its unsuccessful effort to have Dyevich's counterclaims dismissed, and approximately fifteen months after the filing of the Complaint, WCW invoked the arbitration clause in the Royalty Agreement—the Agreement to which it initially and strenuously claimed it was not a party—to have the matter returned once again to arbitration. (Doc. 61 at 3.) However, "a litigant is not entitled to use arbitration as a means of aborting a suit that did not proceed as planned in the District Court." *La. Stadium*, 626 F.3d at 161. "In assessing the amount of litigation for purposes of a waiver analysis, courts consider . . . any motion practice engaged in by the parties and the extent of discovery that the parties have exchanged." *De Jesus*, 2022 WL 3097883, at *9. "A party need not have made dispositive motions on the merits in order to be deemed to have waived arbitration." *Id.*

WCW's efforts to dismiss the arbitration proceedings and its declaratory judgment action and subsequent active participation in litigation in this forum evince an intent to forego arbitration in favor of court litigation. Although WCW has now changed its position regarding arbitration, its suit in federal court after years of resisting arbitration must fairly be interpreted as "the intentional relinquishment or abandonment" of its right to arbitrate. *Morgan*, 142 S. Ct. at 1713 (internal quotation marks omitted). "[A] party may waive its right to arbitration by expressly indicating that it wishes to resolve its claims before a court. Generally, 'a party may not freely take inconsistent positions in a lawsuit and simply ignore the effects of a prior filed document.'" *Schreiber*, 2017 WL 5564114, at *7 (quoting *Apollo Theater Found., Inc. v. W.*

*Int'l Syndication*, No. 02 Civ. 10037(DLC), 2004 WL 1375557, at *3 (S.D.N.Y. June 21, 2004)).

This discourages a party from "play[ing] fast and loose with the courts by asserting inconsistent

positions concerning its intent to pursue arbitration" and "is necessary to prevent delay and

ensure the integrity of the judicial process." *Id.* (internal quotation marks omitted). "The

judicial system was not designed to accommodate a [party] who elects to forego arbitration when

it believes that the outcome in litigation will be favorable to it, proceeds with extensive discovery

and court proceedings, and then suddenly changes course and pursues arbitration when its

prospects of victory in litigation dim. Allowing such conduct would ignore the very purpose of

alternative dispute resolution: saving the parties' time and money." *Gutierrez v. Wells Fargo*

*Bank, N.A.*, 889 F.3d 1230, 1236 (11th Cir. 2018).

WCW asserts they have not waived arbitration because "[t]he parties have not done any

depositions, engaged experts or taken any steps other than the normal beginnings of any

litigation." (Doc. 100 at 11.) Third-Party Defendants assert they have an even stronger case

against waiver because "[t]hey were brought into the case by Atlantis Industries, Inc. and Kevin

Dyevich and took no actions to initiate litigation." (*Id.*) They contend that they "have engaged

in motion practice solely related to the request for arbitration" and thus any participation in the

litigation should not constitute waiver. (*Id.* at 12.)

The Court recognizes that Third-Party Defendants did not join the Complaint, but they

were parties to each of the previous arbitrations. They also did not assert that the matter should

remain in arbitration after proceedings began in this Court. Their Answer to the Third-Party

Complaint did not raise arbitration as an affirmative defense. (Doc. 36, Answer of Third-Party

Defendants.) The Third-Party Defendants filed an Answer to Defendants' Third-Party

Complaint (Doc. 36) and participated in discovery (*see* Docs. 47, 55, 77). Like its business

counterpart WCW, Third-Party Defendants appeared content to proceed in federal court. In September 2022, WCW's counsel also entered an appearance on behalf of the MPL entities and John W. Wilkinson. (Doc. 89.) At the evidentiary hearing, WCW's witnesses were WCW President Jeffrey Wilkinson and John W. Wilkinson, formerly of MPL. As detailed above in this Report and Recommendation, the testimony established a close business relationship between WCW, John W. Wilkinson, and MPL, Ltd., suggesting a practical unity of interests among them. Therefore, the evidence of waiver of the right to arbitration should apply with equal force to WCW and Third-Party Defendants.

## Conclusion

For the reasons discussed above, I recommend that Third-Party Defendants' Motion to Compel Arbitration (Doc. 60) and WCW's Motion to Invoke Arbitration (Doc. 61) be DENIED. It is my recommendation that WCW, Atlantis Industries, Inc., Wilkinson, and MPL are parties to the Royalty Agreement containing an enforceable arbitration provision. I further recommend that the Court find that WCW, MPL, and Wilkinson have waived their right to arbitration. Consequently, this matter should remain in this Court for further proceedings.

Dated at Burlington, in the District of Vermont, this 14th day of August 2023.

_/s/ Kevin J. Doyle_____
Kevin J. Doyle
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).