UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2??? OCT 12  PM 1: 20

| | | |
|---|---|---|
| WCW, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:19-cv-243 |
| | ) | |
| ATLANTIS INDUSTRIES, INC. and | ) | |
| KEVIN DYEVICH, | ) | |
| | ) | |
| Defendants / Counterclaimants / | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| M.P.L., LTD., BAHAMAS; M.P.L., INC., | ) | |
| BELIZE; JOHN M. WILKINSON; and | ) | |
| WCW, INC., | ) | |
| | ) | |
| Third-Party Defendants / | ) | |
| Counterclaim Defendants. | ) | |

## ORDER ADOPTING REPORT AND RECOMMENDATION
### (Docs. 60, 61, 102)

Almost four years after plaintiff WCW, Inc. ("WCW") filed this lawsuit, the parties are

still litigating whether their dispute over a Royalty Agreement must be resolved in arbitration or

instead in court. Following two days of evidentiary hearings, United States Magistrate Judge

Kevin Doyle issued a 51-page Report and Recommendation ("R&R") on August 14, 2023.

(Doc. 102.) The R&R recommends that the court deny WCW, Inc's Motion to Invoke

Arbitration (Doc. 61) and the above-captioned Third-Party Defendants / Counterclaim

Defendants' Motion to Compel Arbitration (Doc. 60).

The proponents of arbitration[1] have filed an objection to the R&R. (Doc. 103.) Defendants Atlantis Industries, Inc. ("Atlantis") and Kevin Dyevich filed a response requesting that the court overrule the objection and adopt the R&R. (Doc. 104.) After careful review of the file and the R&R, the court ADOPTS the recommendations in full for the reasons stated in the R&R. The Motion to Invoke Arbitration (Doc. 61) and the Motion to Compel Arbitration (Doc. 60) are DENIED.

## **Background**

The R&R relies upon the factual background in the court's January 2021 and June 2022 Orders (Docs. 51, 72), "as supplemented by the testimonial and documentary record developed during the evidentiary hearing held on November 16 and 18, 2022." (Doc. 102 at 2.) The R&R reviews the factual and procedural history leading up to the evidentiary hearing (including the origins of the dispute, previous arbitration efforts, WCW's Complaint in this court, and the Arbitration Proponents' motions). (Doc. 102 at 2–9.) The R&R then summarizes the evidence produced at the November hearing and the parties' post-hearing memoranda. (*Id.* at 9–16; *see also* Docs. 97, 99 (transcripts); Docs. 100, 101 (memoranda).) The court presumes familiarity with all of the above. The court includes here a brief summary of factual and procedural background to aid the analysis that follows; additional facts are discussed as necessary below.

The typewritten Royalty Agreement ("Agreement") identifies Atlantis as the grantee and three parties as grantors: WCW, M.P.L. of Nassau, Bahamas, and John Wilkinson. (Doc. 60-3 at 2.) The Agreement provides that Dyevich's company Atlantis is entitled to receive one-third

---

[1] The parties advocating for arbitration are M.P.L., Ltd., Bahamas; M.P.L., Inc., Belize (the "MPL Defendants"); WCW, Inc.; and John W. Wilkinson (collectively, the "Arbitration Proponents"). Although Wilkinson's middle initial is listed as "M." in the pleadings, he testified that his middle initial is "W." As in the R&R, the court refers to him as John W. Wilkinson or Wilkinson. (*See* Doc. 102 at 1 n.1.)

2

of the royalties from sales of "Self-Adjusting Technology" mattress products. (*See id.* at 2.)  The

Agreement also includes an arbitration clause. (*Id.* at 6, ¶ 10.)  Each page of the Agreement

includes the typewritten date "12/09/99" at the bottom.  The final page of the Agreement

includes the following signature block:



(*Id.* at 8.)  Of particular relevance to the issue of the enforceability of the arbitration clause

against WCW, the Agreement includes handwritten markings and initials in the margin; several

of the handwritten markings purport to strike "WCW" from key definitions and terms, including

the section defining "Royalties." (*See* Doc. 60-3; *see also* Doc. 102 at 23 (describing

handwritten modifications).)

The Arbitration Proponents argued to the Magistrate Judge that the Agreement was not a

valid and binding contract and that, consequently, its provisions for royalty payments are

unenforceable. (*See* Doc. 100.)  The Arbitration Proponents also argued that, even if the court

does not dismiss Atlantis and Dyevich's claims, the Agreement's arbitration provision is

severable, enforceable, and not waived. (*See id.*; *see also* Doc. 102 at 15–16 (summarizing

points in Arbitration Proponents' post-hearing memorandum).)  Atlantis and Dyevich argued that

WCW was a party to the Agreement and that WCW and the Third-Party Defendants had waived

3

their right to arbitrate. (*See* Doc. 101; *see also* Doc. 102 at 16 (summarizing points in Atlantis and Dyevich's post-hearing memorandum).)

**Standard of Review**

A district judge must make a de novo determination of those portions of a magistrate judge's report and recommendation to which an objection is made. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Although the court applies de novo review to issues subject to such objections, the court gives "appropriate deference to the credibility determinations made by [the Magistrate Judge] who conducted evidentiary hearing and observed the witness testimony firsthand." *United States v. Wofford*, 527 F. Supp. 3d 486, 489 (W.D.N.Y. 2021); *see also Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge."). The district judge "may accept, reject, or modify, in whole or in part," the magistrate judge's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

**Analysis**

The Arbitration Proponents argue that the Magistrate Judge erred in three ways: (1) by finding that the Royalty Agreement was a valid agreement; (2) by finding that WCW waived its right to arbitration; and (3) by finding that John W. Wilkinson and the MPL Defendants waived arbitration. (Doc. 103.) Defendants maintain that there is ample support for the Magistrate Judge's findings and conclusions. (Doc. 104.)

## I.      Enforceability of the Royalty Agreement

The enforceability of the Royalty Agreement turns on several issues of contract formation. The parties disagree as to whether there was a "meeting of the minds." They also

4

dispute Wilkinson's authority to bind WCW. Finally, the parties differ as to whether WCW ratified the Agreement. The court applies New Jersey contract law[2] and considers each of these issues in turn below.

## A.    Meeting of the Minds

The Magistrate Judge concluded that the evidence shows that the Agreement (with its incorporated arbitration provision) is an enforceable contract. (Doc. 102 at 21–30.)  The R&R recognizes that "WCW" is stricken from the agreement in several instances, albeit only with John W. Wilkinson's (and not Dyevich's) initials in the margin next to those changes.  (*Id.* at 23.)  The Magistrate Judge found that, when Dyevich met John W. Wilkinson to obtain Wilkinson's signature on the Agreement, Dyevich declined to add his initials to the changes striking out WCW.  (*Id.* at 24.)

The Magistrate Judge credited Dyevich's testimony that Dyevich was reluctant to execute the contract without WCW as a party, particularly given the testimony that MPL had a limited function.  (*Id.*)  The Magistrate Judge also credited Dyevich's explanation of "the initialing procedure as it pertains to which entities were the intended parties to the contract."  (*Id.* at 25.) Dyevich's testimony was that, during the April 25, 2001 meeting with Wilkinson,[3] Dyevich

---

[2] The Agreement selects New Jersey law as governing. (Doc. 60-3 at 5 ¶ 9.)  Although the Arbitration Proponents' Objection cites both New Jersey and Vermont law (*see* Doc. 103 at 4), there appears to be no dispute that New Jersey law applies.

[3] Dyevich testified that he met with John W. Wilkinson in Hoosick Falls, New York "on February 25, 2001" (Doc. 99 at 16:7) but his reference to February appears to be a misstatement.  Dyevich's testimony was that, by the time he met with Wilkinson in Hoosick Falls, Dyevich had already signed the Agreement (on February 26, 2001) and Howard Lawrence returned the agreement to Dyevich in April 2001 after Lawrence added his signature (dated April 2, 2001).  (Doc. 99 at 15:16–16:2.)  The court understands Dyevich's testimony to be that he met with Wilkinson on *April* 25, 2001—the same date that appears under Wilkinson's signature on the Agreement.

5

voiced his concern about removing WCW as a party to the contract, and Wilkinson agreed that they could "move forward and he could go ahead and sign the contract in its entirety under that understanding." (Doc. 99 at 17:5–7.)

Considering the text of the Agreement and the testimonial evidence, the Magistrate Judge concluded that "Dyevich and Wilkinson mutually agreed that WCW was a party to the Agreement" and that "the parties shared a mutual understanding of the purpose of the Agreement." (Doc. 102 at 25.)  The Magistrate Judge reasoned that this conclusion was supported by consistent testimony of a "common understanding that Dyevich would share in royalties" and by the evidence related to the execution of the Agreement, including the signature block and the sequence of signatures.  (*Id.* at 25–28.)

The Arbitration Proponents assert that the R&R's finding of a mutual understanding between the parties is erroneous because "both John Wilkinson and Kevin Dyevich testified that they did not reach agreement on the handwritten alterations to the contract." (Doc. 103 at 4.) The Arbitration Proponents contend that, "[a]s signed, the contract shows a complete lack of a meeting of the minds, and it is evident that Howard Lawrence never ratified the terms of the altered document with MPL because he signed it nearly a month before John Wilkinson altered the proposed contract." (*Id.* at 5.)

The Arbitration Proponents correctly recite the applicable basic principles of contract formation under New Jersey law.  "A legally enforceable agreement requires 'a meeting of the minds.'" *Arafa v. Health Express Corp.*, 243 N.J. 147, 171, 233 A.3d 495, 509 (2020) (quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 442, 99 A.3d 306, 313 (2014)); *see also Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 236 N.J. 301, 319, 199 A.3d 766, 777 (2019) ("As a general principle of contract law, there must be a meeting of the minds for an agreement

6

to exist before enforcement is considered."). The "meeting of the minds" must be "based on a common understanding of the contract terms." *Morgan v. Sanford Brown Inst.*, 225 N.J. 289, 308, 137 A.3d 1168, 1180 (2016). For a written contract, a "meeting of the minds" is "evidenced by a written offer and an unconditional, written acceptance." *Morton v. 4 Orchard Land Trust*, 180 N.J. 118, 129–30, 849 A.2d 164, 170 (2004).

Consistent with these principles, no contract would have been formed if Dyevich did not understand and accept the material terms of the parties' agreement. Here, the evidence supports the determination in the R&R that Dyevich and Wilkinson were negotiating the terms when they met and reviewed the typewritten agreement on April 25, 2001. Wilkinson proposed revising the typewritten agreement and marked the changes he proposed with his initials in the margin. Except for excising the "Affiliate" paragraph (where he added his initials to Wilkinson's), Dyevich rejected those proposals and declined to initial them.

Dyevich's disagreement with Wilkinson's proposals does not preclude contract formation. By the time of Dyevich's meeting with Wilkinson on April 25, 2001, the typewritten Agreement already bore two signatures: Dyevich's and Lawrence's. As explained in the Restatement, Lawrence's signature can be regarded as accepting Atlantis's offer and as making a similar offer to the remaining proposed parties: WCW and John W. Wilkinson. Restatement (Second) of Contracts § 22 cmt. a. WCW and Wilkinson therefore had the power of acceptance, but Wilkinson requested changed terms at the April 25, 2001 meeting and marked his requested changes on the typewritten document.

If Wilkinson accepted and signed the Agreement on the condition that all of his handwritten changes be adopted as terms to the purported contract, then no contract would have been formed. Under the Restatement, "[a]n acceptance which requests a change or addition to

7

the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms." Restatement (Second) § 61 (cited with approval in *Gaglia v. Kirchner*, 317 N.J. Super. 292, 300, 721 A.2d 1028, 1032 (App. Div. 1999)).  But the Magistrate Judge credited Dyevich's testimony that Wilkinson agreed to "go ahead and sign the contract" with the "understanding" that Dyevich would not agree to striking WCW as a party. (Doc. 102 at 24.)  The record fully supports that credibility determination.  Accordingly, the agreement that Wilkinson had the power to accept—and the agreement that he did accept—was the typewritten agreement without the handwritten notations striking WCW.

The Arbitration Proponents further contend that there was no meeting of the minds because Howard Lawrence—who signed the Agreement on April 2, 2001 under the block for MPL, Inc.—"never ratified the terms of the altered document with MPL because he signed it nearly a month before John Wilkinson altered the proposed contract." (Doc. 103 at 5.)  But because the record shows that Wilkinson ultimately consented to the typewritten agreement without the handwritten notations striking WCW, there was no need for Howard Lawrence to ratify it.  The offer that Wilkinson accepted was the same offer that Dyevich made and that Lawrence accepted.[4]

---

[4] It appears that Wilkinson and Dyevich could have bound themselves to the removal of the "Affiliate" paragraph without jeopardizing the enforceability of the remainder of the contract. *See* Clark E. Alpert, Guide to N.J. Contract Law § 7.1 (5th ed. 2020) ("[S]ome of the parties to a multi-party contract may agree to amend the contract among themselves without the consent of the other parties.").  In any case, no party argues that the presence or absence of the stricken "Affiliate" paragraph is material to any issue before the court.  The fact that Dyevich's initials appear next to that stricken text but not next to Wilkinson's other notations further supports the sequence of events recounted in the R&R.

8

### B.      Wilkinson's Authority

The Arbitration Proponents also contend that John Wilkinson did not have authority to

sign for WCW.  (*Id.* at 6.)  The R&R includes a detailed discussion of Wilkinson's authority to

bind WCW.  (Doc. 102 at 30.)  Although John W. Wilkinson was not a WCW officer or

shareholder, he was the chairman of WCW's board of directors; one of his signatures on the

Royalty Agreement under the WCW block includes the handwritten notation "Chairman."

(Doc. 60-3 at 8.)  Apart from an initial contact with John W. Wilkinson's son Jeffrey Wilkinson,

John W. Wilkinson was Dyevich's sole contact for WCW.  (Doc. 102 at 32.)  Additionally,

"WCW depended on Wilkinson and/or MPL for use of its patents in product manufacturing and

for occasional infusion of capital."  (*Id.* at 33.)  Wilkinson also "continuously and independently

contracted with Dyevich throughout the course of their business relationship."  (*Id.*)  The record

fully supports those findings.

### 1.      Actual Authority

The facts and circumstances also support the Magistrate Judge's conclusions that

Wilkinson had actual authority to bind WCW.  Wilkinson's "established financial relationship"

with WCW (Doc. 102 at 33), his function developing market opportunities for manufacturing (*id.*

at 34), and his course of conduct with Dyevich over many years (*id.* at 32) support the inference

that Wilkinson had actual authority to sign contracts for WCW.  *See Automated Salvage Transp.,

Inc. v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 617 (D.N.J. 1999) (observing that "[m]ost

actual authority . . . is created by implication" and that "an agent has implied authority to

undertake all transactions necessary to fulfill the duties required of an agent in exercise of

express authority"); *Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 338, 634 A.2d 74, 79 (1993)

("Implied authority may be inferred from the nature or extent of the function to be performed,

9

the general course of conducting the business, or from particular circumstances in the case."

(quoting *Carlson v. Hannah*, 6 N.J. 202, 212, 78 A.2d 83 (1951))). The court finds no error in the

Magistrate Judge's decision to discount Jeffrey Wilkinson and John W. Wilkinson's testimony to

the contrary. (*See id.* at 33.)

## 2.   Apparent Authority

Similarly, the record amply supports the Magistrate Judge's conclusion that, "given the

longstanding course of dealing between Dyevich and Wilkinson, Dyevich reasonably relied on

Wilkinson's apparent authority to act on WCW's behalf." (Doc. 102 at 34.)  New Jersey law

recognizes that a person who is not a principal's "actual" agent can bind the principal "[w]here

the principal's actions cause the third party to reasonably believe in the agent's apparent

authority." *Recom Corp. v. Miller Bros.*, No. 16-3320, 2018 WL 3930090, at *5 (D.N.J.

Aug. 16, 2019).  The R&R discusses the course of dealing between Dyevich and Wilkinson in

detail.

The Arbitration Proponents argue that there is insufficient evidence of any manifestation

by the principal (WCW) that Wilkinson had the purported authority to act on WCW's behalf.  It

is true that apparent authority is "based on manifestations of that authority by the principal."

*Sears Mortg. Corp. v. Rose*, 134 N.J. 326, 338, 634 A.2d 74, 79 (1993).  And Dyevich testified

that the only communications he had with WCW's president Jeffrey Wilkinson lacked any

substance about John W. Wilkinson's authority.  (Doc. 99 at 23:7–12.)

But there is no dispute that John W. Wilkinson was WCW's chairman.  And the

circumstances in this case support the conclusion that, by placing Wilkinson in that position of

authority, WCW manifested Wilkinson's authority to carry out the business that he did with

Dyevich. *See* Restatement (Third) of Agency § 3.03 cmt. b ("A principal may also make a

10

manifestation by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation."); *see also Lisa Cooley, LLC v. Native, S.A.*, No. 20-CV-5800, 2021 WL 860591, at \*4 (S.D.N.Y. Mar. 5, 2021) (appointing individual as company "chairman" "imbued him with apparent authority to act on its behalf"). The court therefore overrules the Arbitration Proponents' objections to the R&R on these points.

## C.     Ratification

The R&R also concludes that "even assuming Wilkinson did not have the authority to contract on behalf of WCW in 2001, WCW ratified the Agreement through its payment of substantial royalties to Atlantis Industries over a period of years." (Doc. 102 at 38.) The Arbitration Proponents agree that "WCW did send checks to Atlantis Industries, Inc." but that those checks "were payments at the behest of John Wilkinson, not ratification of an agreement between Kevin Dyevich, Atlantis Industries and MPL." (Doc. 103 at 7–8.) The Magistrate Judge considered the evidence that the Arbitration Proponents cite (*see* Doc. 102 at 37) but concluded that the "evidence and testimony as a whole" supported the conclusion that the checks "were royalties from WCW to Atlantis Industries, which amounted to WCW ratifying the Agreement." (Doc. 102 at 38.) The court finds no error in the Magistrate Judge's assessment of credibility and weighing of the evidence on this issue.

## II.     WCW Waived Its Right to Arbitration

Although the Magistrate Judge found that the Agreement (including the arbitration clause) is enforceable, he concluded that "WCW's efforts to dismiss the arbitration proceedings and its declaratory judgment action and subsequent active participation in litigation in this forum evince an intent to forego arbitration in favor of court litigation." (Doc. 102 at 49.) To reach that conclusion, the Magistrate Judge applied a two-factor test—considering (1) the time passed

11

from the start of the litigation to the request for arbitration and (2) the quality and quantity of litigation that has taken place—together "with general contractual waiver principles." (*Id.* at 43, 45 (quoting *Alvarez v. Experian Info. Sols., Inc.*, No. 19-CV-03343, 2023 WL 2519249, at \*9 (E.D.N.Y. Mar. 15, 2023)).) The Arbitration Proponents do not dispute that legal framework but argue instead that the R&R's application of that law was erroneous. They concede that "some time" has passed between the filing of the Complaint and the request to arbitrate but that "only minimal actual litigation occurred during that time." (Doc. 103 at 11.)

The record supports the R&R's summary of the parties' conduct before WCW commenced this lawsuit (*see* Doc. 102 at 46–47) and the fact that WCW's litigation objective in this suit was "to establish as a matter of law that arbitration was unavailable in its ongoing dispute with Dyevich." (*Id.* at 47.) The record also supports the R&R's observation that "[a]fter resisting arbitration for almost ten years, and then initiating litigation in this Court with unequivocal claims that it has no obligation whatsoever to submit to arbitration with Dyevich, WCW has changed course and now elects to proceed to arbitration." (*Id.* at 48.) And WCW made that request "over a year after the filing of the Complaint and significant developments had occurred in the case." (*Id.*)

The Arbitration Proponents disagree with the R&R's characterization of the developments in this case as "significant." They assert that, as in *Bergman v. Spruce Peak Realty, LLC*, No. 11-cv-127, 2012 WL 6212849 (D. Vt. Dec. 13, 2012), the parties in this case "have not done any depositions, engaged experts or taken any steps other than the normal beginnings of any litigation." (Doc. 103 at 11.) The *Bergman* court found that the plaintiffs had not shown a waiver of arbitration, in part because parties had litigated for fewer than two years and had conducted no discovery. *Bergman*, 2012 WL 6212849, at \*6.

12

But *Bergman* is distinguishable. The *Bergman* court did not hold that "litigation of substantial issues going to the merits" is the *only* basis upon which to find an arbitration waiver. *Bergman*, 2012 WL 6212849, at \*6 (quoting *Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457, 461 (2d Cir. 1985)). To the contrary, as the R&R recognizes, "[a] party need not have made dispositive motions on the merits in order to be deemed to have waived arbitration." *De Jesus v. Gregorys Coffee Mgmt., LLC*, 20-CV-6305, 2022 WL 3097883, at \*9 (E.D.N.Y. Aug. 4, 2022) (citing *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 84 (2d Cir. 1998)). And critically, the "merits" of this litigation have overlapped with the question of arbitration since WCW filed its Complaint in December 2019 seeking a judgment that it is not a party to the Royalty Agreement and restraining Atlantis from prosecuting any claims against WCW in arbitration. (*See* Doc. 1 at 5.) The Magistrate Judge properly reviewed the particular circumstances in this case as part of the consideration of general contractual waiver principles together with the time elapsed and the quality and quantity of litigation.

## III.    Wilkinson and the MPL Defendants Also Waived Arbitration

Citing the "close business relationship between WCW, John W. Wilkinson, and MPL, Ltd., the Magistrate Judge found a "practical unity of interests among them" and concluded that "the evidence of waiver of the right to arbitration should apply with equal force to WCW and Third-Party Defendants." (Doc. 102 at 51.) The Arbitration Proponents assert that the MPL Defendants and Wilkinson have not waived arbitration. They note that they did not initiate this litigation and that, apart from seeking to remove the case to arbitration, they have "engaged in no motion practice, and have merely complied with . . . their discovery obligations." (Doc. 103 at 12–14.)

13

The court finds that argument unpersuasive. As noted in the R&R, the Third-Party Defendants did not join WCW's Complaint. (Doc. 102 at 50.) They were parties to each of the previous arbitrations yet failed to assert that the matter should remain in arbitration after proceedings began in this court. (*Id.*) Their Answer did not raise the arbitration issue. (*Id.*) The record supports the Magistrate Judge's finding that the Third-Party Defendants—like WCW—"appeared content to proceed in federal court." (*Id.* at 51.) The waiver determination extends to the Third-Party Defendants.

## Conclusion

The court ADOPTS the Report and Recommendation (Doc. 102) in full. The Motion to Invoke Arbitration (Doc. 61) and the Motion to Compel Arbitration (Doc. 60) are DENIED.

Dated at Burlington, in the District of Vermont, this 12th day of October, 2023.

Geoffrey W. Crawford, Chief Judge
United States District Court